[No. A126005. First Dist., Div. Two. June 30, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES THOMAS JONES, Defendant and Appellant.

COUNSEL

Terrence McQuigg, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon and Bruce Ortega, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**KLINE, P. J.—**

## I. INTRODUCTION

This is our second review of two 2006 Lake County Superior Court drug cases against Charles Thomas Jones. In the first case (No. CR908439), Jones was found guilty upon his "slow plea"[1] of transporting methamphetamine (Health & Saf. Code, § 11379, subd. (a)), one of three charges, with strike and prison-term enhancements found true. In the second case (No. CR908705), Jones entered a negotiated guilty plea to possessing methamphetamine (*id.*, § 11377, subd. (a)) and misdemeanor possession of tear gas (Pen. Code, § 12420), two among 10 counts, plus admitted enhancements. At consolidated sentencing, Jones received a total prison term of 10 years four months.

Jones previously appealed in both cases (*People v. Jones* (Sept. 30, 2008, A119995) [nonpub. opn.]). We vacated the judgments in part, holding that the court erred in refusing to hear a motion alleging ineffective assistance of counsel affecting the result of the first motion to suppress. Our remand directions were that the court take evidence on the renewed claim. If it found ineffective assistance, it would rehear the suppression motion and, if suppression was warranted, set a retrial of the first case and a resentencing in the second. If ineffective assistance was not found, the judgments would stand in each case.

At an evidentiary hearing on remand, the trial court found no ineffective assistance. We disagree and shall vacate the judgment in the first case and remand the matter to the trial court for further proceedings.

---

[1] See *People v. Wright* (1987) 43 Cal.3d 487, 496–497 [233 Cal.Rptr. 69, 729 P.2d 260].

## II. FACTUAL AND PROCEDURAL BACKGROUND

The facts of the offenses are unimportant to the appeal except that the evidence against Jones in the first case derived from a nighttime stop of his vehicle on February 26, 2006, for running a stop sign at an intersection.

On Jones's suppression motion, the critical issue was the truth of Police Officer Greg Piccinini's statement that he saw Jones run the stop sign. (Veh. Code, § 22450.) Apparently conceding that this relatively minor traffic offense was enough to justify the stop and even a custodial arrest (*People v. McKay* (2002) 27 Cal.4th 601, 605, 607, 618 [117 Cal.Rptr.2d 236, 41 P.3d 59]), Jones claimed he came to a complete stop at the sign, Piccinini could not from his position have seen whether he stopped, and the stop was pretextual. These claims were unsuccessfully advanced in a 2006 suppression motion filed and litigated by Jones's original counsel, Thomas Quinn.

### A. Evidence at the 2006 Suppression Hearing

The hearing on Jones's motion to suppress was held on July 31, 2006. Presenting no witnesses in support of the motion, Quinn relied on his cross-examinations of Officer Piccinini and Officer Timothy Hobbs, one of two other officers who quickly appeared at the scene after Piccinini made the stop.

Piccinini testified that about 9:30 p.m. on February 26, 2006, while he was travelling north on Park Street toward its intersection with Arrowhead Road in the City of Clearlake, he saw a green sport utility vehicle (SUV) travelling east on Arrowhead after running the stop sign at the intersection of Park and Arrowhead while moving at about five miles per hour. Piccinini turned right from Park onto Arrowhead to follow the vehicle after it crossed Park, and conducted a traffic stop near the intersection of Arrowhead and Mint Street, about 150 yards east of Park Street. About a minute later, Clearlake Police Sergeant Celli arrived at the scene, asked the driver, Jones, if he could search his vehicle, and was told he could. Piccinini noticed repetitive speech and body movements suggesting Jones was under the influence of a controlled substance and for that reason called Officer Hobbs to the scene. Hobbs arrived in four or five minutes. Sergeant Celli found $160 in $20 bills in Jones's SUV. Jones was arrested for being under the influence of a controlled substance.

On cross-examination that could not have lasted more than 10 minutes, Quinn showed Piccinini photographs taken of the intersection of Park and Arrowhead by Quinn and Amber Westphal, Jones's "partner" and the mother of their children, who was Jones's codefendant in the second case. Because

Quinn and Westphal did not testify and no defense witnesses were presented, the probative value of the photographs, if any, was never explained by the defense. In any case, Quinn asked Officer Piccinini whether he recognized three of the photographs (marked for identification as exhibits A, B, and C) as being of the intersection of Arrowhead and Park. Piccinini said he did, and the three exhibits were received into evidence without objection.

Moving to another issue, Quinn asked Piccinini whether he had received information that evening about Jones from the Lake County Narcotics Task Force. Piccinini said he had, and that at the time he made the stop "I was actually going out that direction to see where [Jones's] vehicle was going." Piccinini was unable to explain why Sergeant Celli arrived at the scene so quickly, apparently without being asked. Quinn never asked Piccinini why he needed the assistance of Officer Hobbs, nor did he pursue Hobbs's later testimony that he was called to the scene by Sergeant Celli, not Officer Piccinini.

At the beginning of his testimony, Piccinini stated he was travelling north on Park about 30 yards south of the intersection with Arrowhead when he saw Jones slowly run through the stop sign. Later, when Quinn referred to that earlier statement, Piccinini asked to see the photographs Quinn had offered in evidence and, pointing to an area of a particular photo unidentified by the court or counsel, said: "I was somewhere in the area past this driveway . . . around this area right here where I was visible to see his headlights coming to this stop sign where he did not complete the stop and continued to go through and down on to Arrowhead here." At that point, Piccinini pointed to a telephone pole depicted in the unidentified photograph. Reminding Piccinini of his previous testimony that he was 30 yards from the intersection when he saw Jones's vehicle, Quinn pointed out that the pole was closer than 30 yards. After Piccinini answered that "I would estimate it [as] approximately 30 yards." Quinn stated that he had no further questions. Thus, the only testimonial use made of the photographs taken by Quinn and Westphal was by Piccinini, who asked and was allowed to use an unidentified photo to show where he was located when he saw Jones run the stop sign.

Officer Hobbs testified that he was called to the scene by Sergeant Celli, not Officer Piccinini, as the latter had testified. After examining Jones, Hobbs concluded he was under the influence of a controlled substance, "probably methamphetamine," and arrested him. After Jones was given and waived his *Miranda*[2] rights, he admitted he had used methamphetamine an hour and a half earlier.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).

At the close of the one-day hearing, the motion to suppress was denied. About three months later, on March 14, 2007, new counsel for Jones filed a second motion to suppress, alleging that it was authorized under Penal Code section 1538.5, subdivision (h), because the grounds for this second motion were not raised the first time due to ineffective assistance of counsel. On April 2, 2007, the court declined to hear the motion, because it would entail relitigating issues already decided, and also denied new counsel's request to call witnesses to establish the basis for his offer of proof regarding the ineffective assistance of counsel Jones allegedly received on his first motion to suppress. As earlier noted, we remanded this case to the trial court in 2008 with instructions to inquire into Jones's 2007 claim of ineffective assistance of counsel.

## B. Evidence at the 2009 Hearing on Ineffective Assistance of Counsel

The hearing on whether Jones received ineffective assistance of counsel was conducted on three days over a period of three and a half months in 2009: April 13th, July 27th, and August 13th.[3] Jones and Quinn testified on the first day of the hearing. Professional-standards expert Keith Faulder also testified on the first day of the hearing in April, and investigator Richard Biggs, claimed eyewitness Samantha Sutch, and Jones's "partner," Amber Westphal, all testified at the second day of the hearing in July. The court delivered its decision from the bench on the last day of hearing in August.

*Jones's Testimony*

Jones testified that on the night of February 26, 2006, he was arrested for running a stop sign on Arrowhead Road in the City of Clearlake at the intersection of Arrowhead and Park Street. Jones explained why the configuration of the intersection is "unusual." As one approaches it from Park "you can't even see Arrowhead Street at all . . . until you come up around that sharp corner. You've got to be right on the stop sign coming around that corner to see that stop sign." Jones stated that, because the stop sign on Arrowhead is set back from the intersection with Park, a driver on Park must roll forward and peer around dense trees and bushes "to make sure it's clear" before entering the intersection. Jones recalled coming to a full stop at the sign. He felt that the traffic stop was a pretext, not only because he did not run the stop sign, but also because he had seen task force officers drive by his house before he left that night.

---

[3] The three-month delay between the first and second days of the hearing appears to have been due to the death after the first hearing day of Jones's new lawyer, Stephen D. Tulanian. Jones was represented at the second and third days of the hearing by J. David Markham.

Two of Jones's friends, Samantha Sutch and Marty Franceschi,[4] left his house about the same time Jones did. While the couple did not follow him and had taken a different route, they were right behind him at the stop sign. As far as Jones knew, they did not remain at the scene when he was pulled over.

Jones said he told Quinn about the two percipient witnesses at every meeting he had with him, and told him the stop was "bogus" when he first met him at his arraignment. He gave Quinn the witnesses' common phone number and assumed Quinn would contact them. Quinn wrote down the number the first time, but also asked for it again later. Although Jones pursued this matter repeatedly, Quinn never contacted Sutch or Franceschi.

Quinn filed a suppression motion challenging the traffic stop and ensuing search. On three separate occasions prior to the hearing on the motion, Jones asked Quinn to get an investigator to help establish that Piccinini's claim to have seen him run the stop sign was physically "impossible." Quinn failed to do so, telling Jones "there was 12 public defenders and only one investigator."[5] Shortly before the hearing, when it became clear Quinn would not or was unable to obtain the services of an investigator, Jones asked Westphal to take photographs of the stop sign and other areas of the intersection and Jones gave the photos to Quinn, who offered three of them in evidence.

Jones testified that Sutch and Franceschi attended the suppression hearing and he pointed them out, telling Quinn "that's them right there, those are my two witnesses right there." Quinn did not ask either to testify, however, telling Jones "we didn't need them." After the hearing ended and Jones asked Quinn why he did not call them as witnesses, Quinn reiterated that "we didn't need them," adding that the pictures he and Westphal had taken "would have been enough." Jones complained about this and also about the small size of the three photos Quinn placed in evidence, and the failure of anyone to explain "where those pictures were taken from, what angles those pictures were taken from."

Jones testified that though the stop was made by Officer Piccinini, Sergeant Celli showed up in a separate patrol car at almost the same time, and a third policeman, Officer Hobbs, also quickly appeared at the scene. Asked whether he "suspected that the traffic stop was based on something other than the fact that you were allegedly running a stop sign," Jones said he did and explained

---

[4] The name is variously spelled in the transcripts as Franceschi, Francheski, Franchesky, and Francesky.

[5] Lake County does not have a public defender's office. Quinn was one of 12 private attorneys with whom the county contracts for the provision of defense services to indigent accused persons.

that immediately before the stop, as he left his house, he saw a member of the local drug "task force" drive by. Immediately after his arrest, Jones was placed in a "holding tank," and a task force agent named Anderson tried to interview him. One of the reasons Jones wanted Quinn to obtain an investigator was to develop the information necessary to show that the traffic stop was pretextual.

*Quinn's Testimony*

Quinn's testimony at the hearing was exceedingly equivocal. The gist of it is provided in a declaration he inexplicably filed three weeks earlier. Stating that he learned from our 2008 opinion that he was alleged to have provided Jones ineffective assistance in pursuing the suppression motion, Quinn declared that due to the lapse of time his recollection of the case was "somewhat limited." He allowed that "at least one name, Samantha Sutch, was provided to me by Mr. Jones, but I cannot recollect with certainty that this was done prior to the [suppression] motion." At some unidentified point, Quinn contacted Sutch by phone "and was told by her that she and another individual actually were in a vehicle or vehicles immediately behind Mr. Jones['s] vehicle and saw his vehicle come to a complete and lawful stop at the stop sign at the intersection involved in the incident at issue in the suppression motion."

Based on the foregoing, Quinn allowed that "I surely should have taken note of the names, addresses and phone numbers of any witnesses . . . that were provided to me prior to the hearing and should have proactively queried my clients[6] regarding any such potential persons and should have subsequently had my investigator interview them." Stating his belief that "I made a good faith effort to do the best job possible for my client at the time," Quinn also acknowledged that "it is entirely possible that due to the press of business or my relative inexperience with suppression motion practice at the time, that I neglected to note this information or contact these witnesses in a timely manner to the potential detriment of this case." Quinn also stated that he had "no tactical reason" for failing to call a single witness at the suppression hearing and "did not intentionally fail to do so."

Quinn had been a contract public defender for Lake County for about three years, and had previously worked for about three months for the Mendocino Public Defender, where he first began working on criminal cases. He recognized how crucial it was for Jones to attack the legitimacy of the traffic stop, which was the "the linchpin" in both of the cases against him, because fruits of the traffic stop in the first case had contributed to a warrant search of

---

[6] Quinn's "clients" included Westphal, who was Jones's codefendant in the second case.

Jones's residence that produced the charges against Jones and Westphal in the second case. Jones told Quinn why he believed the traffic stop "was motivated by some reason or some ground other than simply he rolled through or ran through a stop sign." Quinn could not recall the exact reason, but it had to do with the fact the police "had knowledge that he had some contraband on him and they wanted to have a pre-textual stop."

Quinn did not obtain investigative assistance because contract public defenders in Lake County had access to a single investigator unable to satisfy all of their needs for his services. Although he could not recall telling Jones "there's 12 public defenders and there's one investigator so we don't have the resources to investigate all cases," he may have done so because "I made statements like that to clients before." Quinn stated that, given the inability of the single defense investigator to serve all of their needs, contract defenders had to "prioritize our cases" so that "a murder case is going to have more of a priority over, say, a DUI." Quinn's decision to proceed without an investigator was apparently also based on his belief that he was capable of making the necessary investigation of the scene and taking photographs, as was Amber Westphal, who "was very motivated to assist in the defense."

In the course of his own investigation, Quinn noticed that the configuration of the intersection was "unusual" in that Arrowhead was at a higher elevation than Park; "one street goes up a hill and then the stop sign is kind of . . . obscure in a lot of locations . . . when you're coming up the road there. . . . So there's a real issue as to whether—whether an officer or anybody could really—really see—you know, could see whether if someone rolled through that stop or not." Asked whether, from analyzing the police report and discovery materials he had been provided indicating where Officer Piccinini was when he made his observations, he attempted "to determine where that officer was standing relative to the intersection to see if he could actually visually see the stop sign and the limit line from where he claimed to be standing?" Quinn responded that he did. "As I recall from the discovery there, he said that he was at the intersection of another street. I think it began with an M, Milton or Morton or something. And so I went there, and I looked up there, and I took photographs, and it seemed somewhat curious as to whether he could see it there. Of course, there could be issues as to the time of year and the amount of foliage and so on, but it's not a wide open scenario at all."

Quinn believed Westphal did "an excellent job" taking photographs of the area. Between them, they had two or three dozen photos, and for purposes of checking the intersection and circumstances, Quinn felt that he and Westphal had investigated "thoroughly." He attached about nine color photographs as exhibits to the suppression motion, which he filed after unsuccessful efforts to get a "decent offer" and after difficulty in getting Jones free on bail.

Quinn felt sure there were observers at the suppression hearing, but none that were memorable. He asked Jones, "did you bring your witnesses, and he kind of said no." Counsel inquired whether Quinn asked Jones that question because "you were aware that he had told you before the hearing date that, in fact, he had a couple of witnesses that might have some material information to present," and Quinn responded, "That's a fair inference." Quinn did not recall knowing the names or any contact information for witnesses; nor did he recall seeking a continuance. Jones did not chide him then for not calling witnesses. His first complaint came months later, as the trial date approached.

Elsewhere in his testimony, Quinn emphasized his inability to clearly remember whether, *at the time of the suppression hearing*, he knew Sutch and Franceschi were willing to testify in behalf of Jones. Although he was certain the two did not attend the suppression hearing, as Jones claimed, he consistently left open the possibility he knew of these witnesses prior to the hearing and negligently failed to contact them. For example, after stating that his "first memory" of being told about Sutch was after the suppression hearing, Quinn stated that, "in all fairness, I think [Jones] did . . . mention to me that there were people who had witnessed this traffic stop prior to the suppression hearing. The question was who are these people and how could we get in touch with them? . . . I'm pretty confident that he did mention to me—you know, it's not just like after the suppression hearing he said there were people there. I do recall that on . . . more than one occasion . . . there were a lot of other things that we were talking about in dealing with his case, his bail issues. He had a child that . . . had some kind of heart surgery. There . . . were a lot of issues involved. There was this other case and so on. So, yeah, he definitely told me that there were some people that had witnessed the case and in this—you know, that a witness had stopped, and if they could contact them, they could corroborate, you know, his—you know, what he said and heard."

Quinn acknowledged the possibility he had been given Sutch's and Franceschi's names and contact information prior to the suppression hearing at several other times in his testimony. For example, after stating that he did not remember talking to Sutch prior to the suppression hearing, Quinn added that "in all fairness, I think he may have mentioned her prior to that time. I don't know if he . . . gave me her number, and I may have, just due to the press of business or forgetfulness or various other reasons, have neglected or forgotten to call that number prior to that time." Quinn was subsequently asked, "do you remember specifically if [Jones] had told you 'I have witnesses that were at the scene that can testify as to what they saw?' " He answered, "I think so," and affirmed that this happened "before the motion to suppress." Asked whether Jones provided him the names of the witnesses, Quinn was unable to recall, stating "[h]e may have given me their names or their first names," but "the issue for me is whether he had given me their

contact information or not." Quinn remembered a conversation in which he "mentioned" to Jones the need for his help in getting witnesses and Jones "said he was going to help me get these witnesses. But it's possible that he gave me this phone number and due to—due to my—due to negligence that I forgot to—I forgot to call the number. I mean, you know, I'm not perfect. I make mistakes."

When Quinn's attention was called to the fact that Sutch's name and phone number had been handwritten on a page in his file on Jones's case, Quinn acknowledged he put this information there, but said it did not clearly indicate "when I became aware of that information." Quinn admitted, however, that the notation may have been made prior to the suppression hearing: "It may have been in there from before and I may have just neglected to call it before. In other words, he may—there may be an entry there from before, and then maybe he may have, you know, really made an issue of it later on and then I called, so—but—so, I mean, any entry as I recall—any entry that I have that—since we don't have a clerical staff the way the district attorney does or the way, you know, maybe some private lawyers that can afford them do, I do all my own work, secretarial work, all of it. I don't recall that there was any dated entry in the file except the one from maybe February/March of '07. However, as I do recall, I did write her name at the top of my docket sheet there, so I recall being there. So that may have been there from before [the suppression hearing]. And I may—I may have seen that name and not really, you know . . . correlated who she was and why I needed to contact her, so I may have had that number from before."

Near the end of this portion of his testimony, Quinn was reminded that he received a letter from Jones in 2008 asking why he failed to call particular persons as witnesses at the suppression hearing. In a letter dated September 24, 2008, Quinn responded by stating that his recollection was that Jones and Westphal "were going to bring witnesses to court on the day of the suppression hearing." When counsel asked whether this was why, at the suppression hearing "you asked Mr. Jones are your witnesses here," Quinn answered, "[y]es." After counsel asked whether Quinn ended his letter to Jones by stating, "It's entirely possible that you, Mr. Jones, or your wife may have provided me one or both of those names prior to the hearing and that I neglected to note or forgot to contact those persons prior to the hearing," Quinn answered, "That's what I told him, and I would affirm that statement."

*Faulder's Testimony*

Keith Faulder practiced for many years in the Mendocino County District Attorney's Office, where he served as chief trial deputy and eventually assistant district attorney, as a criminal defense lawyer in California and Arizona, and as a state-licensed criminal investigator for the alternate public

defender in San Diego County. His testimony related to "the standard . . . of competence for an attorney in handling a suppression motion, in terms of investigating and calling witnesses."

Faulder stated that if a competent criminal defense lawyer believed his client's Fourth Amendment rights might have been violated, the first things he would do would be to talk to his client and obtain his version of the events and locate any witnesses able to corroborate the client's testimony. "[I]f there were percipient witnesses, certainly those witnesses would have to be located, interviewed and subpoenaed for the motion hearing; I would definitely hire an investigator."

Asked what a competent lawyer would do "if you're in a public defender office or in a private defense firm and there's one investigator and there's 12 attorneys, what do you do to prioritize or do you prioritize?" Faulder responded that defense counsel cannot prioritize in the sense of thinking "one case is more important or deserving of attention than another case . . . . [E]very defendant is entitled to a competent defense, and so each case is just as important, certainly to that defendant, but to me as an attorney as well." Relying on *In re Edward S.* (2009) 173 Cal.App.4th 387 [92 Cal.Rptr.3d 725], Faulder stated that "if there ever came a time where I needed resources and my office wouldn't give me those resources, then I would have to advise the Court that I was unable to proceed in a competent manner because I didn't have the resources available to me." When counsel pursued this line of questioning, asking Faulder what he would do if he were unable to secure the services of an investigator, the district attorney objected on the ground of relevance, claiming, "I don't think there's any issue here in regards to lack of resources in terms of hiring an investigator." After defense counsel pointed to Quinn's testimony that he declined to obtain the use of an investigator because there was only one investigator for 12 attorneys, and he and the investigator both had to "prioritize," the trial judge overruled the objection. Faulder then opined that a competent attorney unable to obtain an investigator "would either ask the Court for those resources or ask to withdraw from the case, because I would have a duty to proceed [competently], and I wouldn't be able to if I couldn't have those resources."

In Faulder's opinion, a criminal defense attorney has the duty to produce witnesses in support of a suppression motion he or she has filed, and cannot shift that responsibility to the client. Counsel must "investigate the information that was provided by the client," diligently attempt to locate potential witnesses, and subpoena them to insure their appearance. A subpoena is also useful in the event a witness fails to appear, Faulder explained, because the failure of a witness to comply with a subpoena provides a basis for the court to grant a continuance, which in that situation counsel should request.

"The most important thing," Faulder stated, "is to make sure I locate those witnesses and interview them before the hearing, because I don't want to be interviewing them in the hall just before the hearing. I want to make sure I know what they're going to say and that their testimony is going to be helpful to my client." Asked what competent counsel would do if he learned at the suppression hearing of the existence of a previously unknown percipient witness who would corroborate his client's testimony, Faulder stated he would explain the circumstances to the court and request a continuance.

Faulder felt Quinn's representation of Jones at the suppression hearing was deficient in that he failed to (1) exercise due diligence in locating, interviewing and subpoenaing witnesses able to corroborate Jones's testimony regarding the validity of the stop; (2) move for a continuance of the suppression hearing in order to secure such witnesses; (3) obtain a qualified investigator to examine the scene and produce evidence that could be used to impeach Officer Piccinini's testimony; and (4) file a *Pitchess* motion (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305]) "to find out if there were other complaints about this officer fabricating evidence and not telling the truth."[7]

If, prior to the hearing, Quinn had learned of percipient witnesses able to corroborate Jones's testimony, due diligence required him to try to locate and interview them and, if their testimony would be useful, subpoena them to ensure their appearance. According to Faulder, if Quinn learned of the witnesses only on the day of the hearing, before or while evidence was presented, he should have asked for a continuance to locate those witnesses, because the suppression motion was crucial to the defense and it could not succeed without affirmative evidence. Further, Faulder went on, if his inability to locate and interview witnesses "was because of some resource issue, I would have asked to withdraw. If I didn't have the ability as an attorney to go out and get those witnesses, I would have had to have told the Court I need these witnesses and I can't get them; I'm either going to have to withdraw or ask the Court for those resources."

In Faulder's view, a competent defense attorney would have known that Officer Piccinini's ability to have observed Jones run the stop sign from the place at which he said he was located was the central issue in the case, and that it would not be enough just to cross-examine him. "You need to present some affirmative defense evidence to show that that couldn't have been true for that officer to make those observations." Faulder felt that the testimony of two witnesses that they saw Jones make a full stop at the stop sign would place Officer Piccinini's credibility in question. He also faulted Quinn for failing to pursue Piccinini's testimony that he communicated with the Lake

---

[7] Jones does not on this appeal pursue Quinn's failure to file a *Pitchess* motion.

County Narcotics Task Force about Jones shortly before stopping him, which suggests a different reason for the stop that might diminish the credibility of Piccinini's crucial representation that he saw Jones run the stop sign.

Quinn's failure to obtain the testimony of percipient witnesses was, in Faulder's view, exacerbated by his failure to provide any other affirmative defense evidence. A trained investigator would have been able to take and authenticate photographs, make appropriate measurements, and explain the significance of this evidence through testimony at the suppression hearing, as Quinn could not. Instead of putting himself in the "awkward" position of being a witness for his own client, and relying on Westphal, Jones's codefendant in the second case, who was self-interested and not a trained investigator, Quinn needed a qualified expert "who has a separation from the case that's going to be credible that can be cross-examined. It's just not a good idea to be a witness yourself in your client's case." In Faulder's view, competent defense counsel must obtain the services of an investigator in cases such as this one, in which the crucial issue is "where a witness was standing when certain critical observations were made," and it is possible for a trained person to test the witness's claim.

For the foregoing reasons, Faulder concluded that Quinn's representation of Jones was below the standard expected of competent criminal defense counsel.

*Biggs's Testimony*

Richard Biggs, who was hired as an investigator by Jones's new counsel, read the description of the traffic stop in the police report, visited the scene of the stop on four separate occasions in March and April of 2007, took photographs, made measurements, and conducted visibility experiments at the intersection with the help of an assistant who drove through the stop sign at various times as instructed by Biggs while the latter viewed and took photos from various locations on Park Street at and near the place from which Piccinini said he saw Jones run the stop sign. The thesis of Biggs's testimony is that a person located at the place on Park Street, where Piccinini said he was located when he saw Jones run the stop sign on Arrowhead, could not see that stop sign or tell from a vehicle's headlights whether it had rolled through the stop sign without stopping.

Biggs prepared and authenticated nine exhibits (A through I) consisting of photographs taken of the intersection and other streets crossing Park or Arrowhead in the vicinity of the stop sign. Biggs situated himself in a vehicle on various locations on Park Street facing north, toward the intersection with Arrowhead Road. Initially, he placed himself at the intersection of Park

and Lakeshore Drive, immediately south of the intersection of Park and Arrowhead and then moved north on Park to locations progressively closer to Arrowhead. From each of the locations—which he marked on a diagram identified as exhibit J—Biggs looked to see whether the stop sign facing eastbound traffic on the right side of Arrowhead was visible from Park Street. Biggs also took photographs of the intersection from each location on Park indicated on exhibit J, and described and explained the significance of each photograph. At none of the locations south of the intersection was Biggs able to see the stop sign on Arrowhead Road. Because the stop sign on Arrowhead was set back from the intersection with Park and obscured by trees and brush, he was able to see the stop sign only when he "entered into the intersection" at the place marked on exhibit J with a blue circle and an X.

Biggs also authenticated two photographs marked for identification as exhibits K and M, which were "actual photo[s] of the stop sign taken from the Internet" in 2008. Exhibit K is a photograph of the intersection taken from Park just south of Arrowhead. Exhibit M is a photograph of the intersection from Arrowhead looking east toward Park, with the stop sign on the right side of the photo. Biggs testified that both photographs constitute "a fair and accurate depiction of the scene as he saw it back in March of '07," except that the bushes in the photos are "slightly higher." The district attorney objected to the receipt in evidence of these two photographs on the ground that they lacked foundation, but they, and all the other evidence Biggs described, were received in evidence by the court.

Biggs also conducted a nighttime "experiment" designed to establish the first point on Park Street from which it was possible to see a car or the headlights of a car coming across Park through the intersection. Standing on Park Street next to a gate at a place indicated on the diagram by counsel,[8] and thereafter at each of the other locations marked on exhibit J, Biggs directed his assistant to drive eastward on Arrowhead across the intersection. He was unable to see his assistant's car, or any vehicle, stop at the sign at any of the indicated locations because "a large grove of bushes" depicted on one of the exhibits "block[ed] the line of sight between you and the stop sign as you were standing on Park Street." Placing himself at the same locations indicated on exhibit J, Biggs moved progressively closer to the intersection, trying to establish the point at which he could first tell whether a car driven by his assistant had stopped at the stop sign. Biggs was able to see the

---

[8] The location on Park Street indicated by counsel is presumably that which Piccinini identified in the police report as the place from which he saw Jones run the stop sign. The transcript is unclear about this, however; all it necessarily indicates is that the location was on Park near a gate south of the intersection.

headlights of vehicles approaching the intersection travelling east on Arrowhead but, because the "large grove of bushes" depicted in the exhibits "block[ed] the line of sight," it was not possible to tell from the light they cast whether the vehicle had stopped at the sign or run through it. This was so even when he was on Park immediately below the intersection.

*Sutch's Testimony*

Samantha Sutch had known Jones for quite a few years. She drove to his house that night with Franceschi, to drop off Jones's brother, and did not enter the house. She left with Franceschi to go home and, where the street she was on met Arrowhead, saw Jones pass her in his Explorer. She pulled onto Arrowhead directly behind him and saw him make a full stop behind the line at the stop sign at Park. She was "most definitely" sure of this because she "almost ran into him." Asked why she almost ran into him, Sutch explained that the line on Arrowhead Road by the stop sign was "way back" from Park Street, so "in order to see if it's clear to go you have roll up a little" to Park. Unlike Jones, who continued eastward on Arrowhead, Sutch turned right on Park and therefore did not witness the traffic stop, which was made on Arrowhead about 150 yards east of the intersection. She learned about his arrest when she called Westphal shortly after getting home. Learning that Jones had supposedly run the stop sign, Sutch told Westphal that he made a complete stop and offered, "[I]f you need me to testify about that I will."

Sutch was contacted about testifying by an investigator but was not sure whether he was hired by Quinn or Jones's new lawyer. She told the investigator that she saw Jones stop at the stop sign. She prepared a typed statement, but this was not until April 2007, and referred at the time to notes she had made on a calendar she had since placed in storage. Sutch also told Quinn that she saw Jones stop at the stop sign, but could not remember exactly when this conversation took place. Though "not sure" whether she received a subpoena to appear in court, Sutch stated that "I came to court but I was never called to the stand."

*Westphal's Testimony*

Westphal testified that several photographs offered into evidence by Quinn "looked like" those taken by her of the intersection of Arrowhead and Park a month or more after the traffic stop. She did not modify them in any way. Westphal said she was home the night Jones was stopped, recalled Sutch stopping by the house for "a minute," but did not recall anyone else being there.

## C. The Trial Court's Ruling

On August 13, 2009, the court ruled orally from the bench as follows: "[T]he record establishes that Mr. Quinn prior to the suppression motion visited the scene himself, took his own photographs. That he had interviewed Amber Westphal, the wife or significant other of the defendant. Got his photographs from her. That he, in fact did bring the suppression motion and he had to have interviews with the defendant prior to that.

"The issue seems to then revolve around whether or not he knew about and failed to call the defense witnesses . . . Samantha Su[t]ch and Marty Francesky.

"The evidence that I've heard preponderates in favor of Mr. Quinn that he did not know of these witnesses. I'm struck by the fact that Mr. Quinn testified that there would have been no reason for him not to call them if they were there and he knew about them. And I think that's a correct statement. I'm sure that he would have called them. I believe that portion of the testimony that he did not know about them. And I don't find that it's incompetency of counsel for him not to have located those witnesses at the time.

"So the court would find that there was not an adequate showing . . . of inadequate representation by Mr. Quinn to have justified the holding of a second suppression motion . . . . But having heard the evidence under [the Penal Code section] 1538.5 motion that's been presented this time around, the Court would order it would still be the same. That the evidence is not at all clear that the defense is correct that the officer couldn't have seen what he'd seen or what he testified that he saw, and therefore the motion would have been denied by the Court given the new evidence that was presented."

## III. DISCUSSION

■ Under the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has a right to the assistance of counsel. "The ultimate purpose of this right is to protect the defendant's fundamental right to a trial that is both fair in its conduct and reliable in its result. [Citations.] [¶] Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.]" (*People v. Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839].)

■ The test for determining whether a criminal defendant received ineffective assistance of counsel is well settled. The court must first determine

whether counsel's representation "fell below an objective standard of reasonableness." (*Strickland v. Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674, 104 S.Ct. 2052] (*Strickland*).) The court then inquires whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694; accord, *In re Wilson* (1992) 3 Cal.4th 945, 950 [13 Cal.Rptr.2d 269, 838 P.2d 1222]; *People v. Bennett* (1998) 17 Cal.4th 373, 383 [70 Cal.Rptr.2d 850, 949 P.2d 947].) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; see *In re Neely* (1993) 6 Cal.4th 901, 909 [26 Cal.Rptr.2d 203, 864 P.2d 474].)

Evaluation of a claim of deficient representation is deferential to counsel; the court must, if possible, indulge the presumption that counsel's conduct "falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Strickland, supra*, 466 U.S. at p. 689.) "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (*Ibid.*) " '[S]econd-guessing' is to be avoided." (*People v. Mincey* (1992) 2 Cal.4th 408, 449 [6 Cal.Rptr.2d 822, 827 P.2d 388].) Stated differently, the question is not what the " 'best lawyers would have done,' " nor " 'even what most good lawyers would have done,' " but simply whether " 'some reasonable lawyer' " could have acted, in the circumstances, as defense counsel acted in the case at bar. (*Coleman v. Calderon* (9th Cir. 1998) 150 F.3d 1105, 1113, revd. on other grounds *sub nom. Calderon v. Coleman* (1998) 525 U.S. 141, 145–147 [142 L.Ed.2d 521, 119 S.Ct. 500].) A defendant must show that his attorney's performance fell below this objective standard of reasonableness by a preponderance of the evidence. (*People v. Mincey*, at p. 449.)

## A.

### Standard of Review

Considered from the perspective of an appellate court, ineffectiveness of counsel "is not a question of 'basic, primary, or historical fac[t].' " (*Strickland, supra*, 466 U.S. at p. 698.) Rather, "both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." (*Ibid.*; accord, *In re Marquez* (1992) 1 Cal.4th 584, 603 [3 Cal.Rptr.2d 727, 822 P.2d 435]; *In re Cordero* (1988) 46 Cal.3d 161, 181 [249 Cal.Rptr. 342, 756 P.2d 1370].) Therefore, as the Attorney General candidly acknowledges, with respect to "whether counsel performed deficiently, or whether any deficiency prejudiced appellant, this Court owes the trial court no deference."

As to those issues, the trial judge's findings are " 'not binding on this court, and we may reach a different conclusion on an independent examination of the evidence produced at the hearing he conducts even·where the evidence is conflicting. [Citation.]' " (*People v. Ledesma, supra*, 43 Cal.3d at p. 219, quoting *In re Branch* (1969) 70 Cal.2d 200, 203, fn. 1 [74 Cal.Rptr. 238, 449 P.2d 174]; see also *People v. Cromer* (2001) 24 Cal.4th 889, 901 [103 Cal.Rptr.2d 23, 15 P.3d 243] [without independent review " '[a] policy of sweeping deference would permit, "[i]n the absence of any significant difference in the facts" ' the application of the Sixth Amendment ' "[to] tur[n] on whether different trial judges draw general conclusions that the facts are sufficient or insufficient to constitute" ' due diligence"].) The factual findings of a trial court are entitled to deference *"only* if substantial and credible evidence supports the findings." (*In re Hitchings* (1993) 6 Cal.4th 97, 109 [24 Cal.Rptr.2d 74, 860 P.2d 466], italics added; see also *In re Avena* (1996) 12 Cal.4th 694, 710 [49 Cal.Rptr.2d 413, 909 P.2d 1017].) Our Supreme Court has emphasized, however, "that deferential scrutiny of counsel's performance is limited in extent and indeed in certain cases may be altogether unjustified. '[D]eference is not abdication' [citation]; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions. Otherwise, the constitutional right to the effective assistance of counsel would be reduced to form without substance." (*People v. Ledesma, supra*, 43 Cal.3d at p. 217.)

Under the foregoing and other applicable principles, the trial court's determination that Quinn provided Jones effective assistance cannot be sustained.

## B.

### Quinn's Representation Fell Below an Objective Standard of Reasonableness

Jones's claim that Quinn's representation was ineffective rests primarily on the failure to investigate; specifically, to (1) locate potential witnesses able to corroborate Jones's claim that he came to a full stop at the stop sign, and (2) obtain an investigator to be able to show that Officer Piccinini could not possibly have seen Jones run through the stop sign, as he testified at the 2006 suppression hearing. Ignoring the second issue, the trial court addressed only the first.

As to the claim that Quinn failed to locate Sutch and Franceschi and subpoena them to testify at the suppression hearing, or at least seek a continuance when no witnesses appeared, the trial court conceived the key issue as being whether Quinn knew of these potential witnesses prior to or at

the time of the suppression hearing. The court determined that the relevant evidence "preponderates in favor of Mr. Quinn that he did not know of these witnesses," because "Quinn testified that there would have been no reason for him not to call them if they were there and he knew about them. And I think that's a correct statement. I'm sure that he would have called them. I believe that portion of the testimony that he did not know about them. And I don't find that it's incompetency of counsel for him not to have located those witnesses at the time."

The court's reasoning is triply flawed. First, the court assumed the existence of the fact it purported to determine. Reasoning that a reasonably competent attorney would have called Sutch to the stand if she had been present in the courtroom, the court inferred from Quinn's failure to call her that she was not present. The premise of this reasoning—that Quinn's representation of Jones was that of a reasonably competent attorney—is, of course, the fact at issue. The second flaw in the trial court's reasoning is the erroneous assumption that a reasonably competent attorney has no affirmative duty to investigate the possibility that percipient witnesses are able to corroborate his or her client's version of the relevant facts. As we explain, this assumption is clearly at war with the law. The third and most fundamental flaw is the court's indifference to Faulder's uncontradicted testimony, which pertained to the central question whether Quinn's conduct fell below an objective standard of reasonableness.

█ Faulder's description of the prevailing professional norms Quinn failed to comply with was highly relevant. The first prong of the *Strickland* test—constitutional deficiency—"is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms,' " and the United States Supreme Court has long "recognized that '[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . . .' " (*Padilla v. Kentucky* (2010) 559 U.S. ___, ___ [176 L.Ed.2d 284, 130 S.Ct. 1473, 1482], quoting *Strickland, supra,* 466 U.S. at p. 688; see *Bobby v. Van Hook* (2009) 558 U.S. ___, ___ [175 L.Ed.2d 255, 130 S.Ct. 13, 16]; *Florida v. Nixon* (2004) 543 U.S. 175, 191 & fn. 6 [160 L.Ed.2d 565, 125 S.Ct. 551]; *Wiggins v. Smith* (2003) 539 U.S. 510, 524 [156 L.Ed.2d 471, 123 S.Ct. 2527]; *Williams v. Taylor* (2000) 529 U.S. 362, 396 [146 L.Ed.2d 389, 120 S.Ct. 1495].)

Faulder's testimony regarding Quinn's duty to investigate is entirely consistent with ABA (American Bar Association) standards. Standard 4-4.1(a) of the ABA's Standards for Criminal Justice Prosecution Function and Defense Function states: "Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to

facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty." (ABA Standards for Criminal Justice Prosecution Function and Defense Function (3d ed. 1993) p. 181.) Commentary to this standard, which is entitled *"The Importance of Prompt Investigation,"* emphasizes that "[e]ffective investigation by the lawyer has an important bearing on competent representation at trial, for without adequate investigation the lawyer is not in a position to make the best use of such mechanisms as cross-examination or impeachment of adverse witnesses at trial or to conduct plea discussions effectively." (*Id.* at p. 183.) The ABA commentary states that "[f]ailure to make adequate pretrial investigation and preparation may also be grounds for finding ineffective assistance of counsel." (*Ibid.,* citing *Strickland, supra,* 466 U.S. at p. 691.) Standards promulgated by the National Legal Aid & Defender Association similarly provide that "[c]ounsel has a duty to conduct an independent investigation regardless of the accused's admissions or statements to the lawyer of facts constituting guilt" and emphasize that "[t]he investigation should be conducted as quickly as possible." (Nat. Legal Aid & Defender Assn., Performance Guidelines for Criminal Defense Representation (1995) Guideline 4.1.)

■ The foregoing standards describe an investigatory responsibility that has long been imposed on criminal defense counsel by federal and state courts. The *Strickland* court described the duty of such counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." (*Strickland, supra,* 466 U.S. at p. 691.) And our own Supreme Court has made clear the right of a criminal defendant to expect not just that his counsel will undertake those actions that a reasonably competent attorney would undertake, but as well "that before counsel undertakes to act at all he will make a rational and informed decision on strategy and tactics *founded on adequate investigation and preparation."* (*People v. Ledesma, supra,* 43 Cal.3d at p. 215, italics added, citing *In re Hall* (1981) 30 Cal.3d 408, 426 [179 Cal.Rptr. 223, 637 P.2d 690], *People v. Frierson* (1979) 25 Cal.3d 142, 166 [158 Cal.Rptr. 281, 599 P.2d 587] and *Strickland,* at pp. 690–691; accord, *In re Edward S., supra,* 173 Cal.App.4th at p. 407 ["a defense attorney who fails to investigate potentially exculpatory evidence, including evidence that might be used to impeach prosecution witnesses, renders deficient representation"]; *People v. Thimmes* (2006) 138 Cal.App.4th 1207, 1212 [41 Cal.Rptr.3d 925] ["standard of reasonable competence requires defense counsel to diligently investigate the case"].) As stated in *In re Neely, supra,* 6 Cal.4th 901, a case involving ineffective assistance in connection with a motion to suppress evidence, "[i]n order to

render reasonably competent assistance, a criminal defense attorney should investigate carefully the possible grounds for seeking the suppression of incriminating evidence, explore the factual bases for defenses that may be available to the defendant, and otherwise pursue diligently those leads indicating the existence of evidence favorable to the defense. [Citations.]" (*Id.* at p. 919.) The reason the duty to investigate must be discharged promptly is so witnesses can be interviewed while events are fresh in their memories. As has been said, "[t]he effects of the passage of time on memory or the preservation of physical evidence are so familiar that the importance of *prompt* pretrial preparation cannot be overstated." (*Lavallee v. Justices in Hampden Superior Court* (2004) 442 Mass. 228 [812 N.E.2d 895, 904], italics added.)

Like the Attorney General, whose central thesis is that "Quinn had no knowledge of the possible existence of witnesses" able to corroborate appellant's testimony, the trial court effectively absolved Quinn of the investigative responsibilities imposed by the professional guidelines and case law just described. The conflicting testimony of Jones and Quinn as to when the former told the latter about the percipient witnesses, which the trial court considered the dispositive fact, is really beside the point. Quinn had a duty to inquire whether Jones's testimony could be supported by others *regardless of whether Jones came forward with this information.* Though a court must ordinarily apply "a heavy measure of deference to counsel's judgments" (*Strickland, supra,* 466 U.S. at p. 691), Quinn admitted his failure to investigate was not a tactical decision and acknowledged that he "should have proactively queried my clients regarding any such potential [witnesses] and should have subsequently had my investigator interview them."

The failure to locate and interview Sutch and Franceschi and produce them at the suppression hearing is not the only, or perhaps even the most significant, investigatory deficiency shown by the record. In the course of explaining why Quinn needed to obtain the services of an investigator, Faulder explained the conflict Quinn created by participating in the "prioritization" of the services of the single investigator available to all 12 contract defenders in Lake County, which subordinated Jones's need for an investigator to the needs of other defendants facing more serious criminal offenses. (See *In re Edward S., supra,* 173 Cal.App.4th at p. 414.) As earlier noted, the trial court overruled the district attorney's objection to defense counsel's questioning of Faulder on the subject of inadequate investigative resources. However, after making that ruling, the court commented that the dearth of investigative resources available to Quinn (and therefore Jones) was "certainly not a major issue." This comment is troubling.

First of all, as Biggs's testimony demonstrates, the probative force of the three poorly authenticated and inadequately interpreted photographs taken by

Jones's codefendant and received in evidence at the 2006 suppression hearing—which Quinn relied upon only because no qualified investigator was available to him—pales in comparison to the evidence that could have been gathered and presented in Jones's behalf by a trained investigator. Because he presented no witnesses *at all* (let alone a disinterested expert witness) able to adequately authenticate, describe and explain the significance of the photographs taken by Westphal, Quinn enabled Officer Piccinini to interpret them without fear of contradiction.

The trial court's minimization of the significance of the inadequate investigatory assistance available to Quinn and Jones, which the prosecution did not refute, also concerns us for another reason. As we recently pointed out in *In re Edward S., supra*, 173 Cal.App.4th 387, studies by the ABA, the United States Department of Justice, and others have shown that " '[f]orty years after *Gideon v. Wainwright* [(1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792]], indigent defense in the United States remains in a state of crisis, resulting in a system that lacks fundamental fairness and places poor persons at constant risk of wrongful conviction' and that, as a result, 'the integrity of the criminal justice system is eroded and the legitimacy of criminal convictions is called into question.' " (*In re Edward S.*, at p. 412, fn. 8, quoting ABA Standing Com. on Legal Aid & Indigent Defendants, Gideon's Broken Promise: America's Continuing Quest for Equal Justice (Dec. 2004) p. 38, boldface omitted.) This unfortunate state of affairs is largely the result of the fact that " '[f]unding for indigent defense services is shamefully inadequate,' so that '[l]awyers frequently are burdened by overwhelming caseloads and essentially coerced into furnishing representation in defense systems that fail to provide the bare necessities for an adequate defense,' specifically including investigative resources, 'resulting in routine violations of the Sixth Amendment obligation to provide effective assistance of counsel.' (*Ibid.*, boldface omitted . . . .)" (*In re Edward S.*, at pp. 412–413, fn. 8.)

In a growing number of states, most recently New York (*Hurrell-Harring v. State of New York* (2010) 15 N.Y.3d 8 [930 N.E.2d 217, 904 N.Y.S.2d 296]),[9] attempts to address such systematic deficiencies in public defender programs

[9] The allegations of the class complaint in this case were based in part on the June 2006 report of the New York State Commission on the Future of Indigent Defense Services, convened by then Chief Judge of New York Judith S. Kaye. The report concluded that " 'the indigent defense system in New York State is both severely dysfunctional and structurally incapable of providing each poor defendant with the effective legal representation that he or she is guaranteed by the Constitution of the United States and the Constitution and laws of the State of New York . . . [and] has resulted in a disparate, inequitable, and ineffective system for securing constitutional guarantees to those too poor to obtain counsel of their own choosing.' " (Com. on the Future of Indigent Defense Services, Final Report to the Chief Judge of the State of New York (June 18, 2006) p. 3 <http://courts.state.ny.us/ip/indigentdefense-commission/IndigentDefenseCommission_report06.pdf> [as of June 30, 2010].) The New York Court of Appeals held that members of the plaintiff class stated a cognizable claim for constructive denial of their Sixth Amendment right to counsel.

are being made in the form of individual and class actions.[10] The judicial response to some of these actions is that the claims for systemic relief are not ripe and are nonjusticiable because, among other things, the members of the putative class have adequate remedies available to them at law: They can present their claims in an appeal or other postconviction proceeding in the action in which the violation of constitutional rights is alleged to have occurred, and the claims can only be evaluated on such a case-by-case basis. (See, e.g., *Platt v. State, supra*, 664 N.E.2d at pp. 362–365 [an action challenging the constitutionality of county public defender system that "lacks sufficient funds for pretrial investigation and preparation which inherently causes ineffective assistance of counsel at trial"].)

 That is precisely what Jones has been doing since 2007. The judicial inquiry he has assiduously sought—which relates to the fundamental fairness of the challenged legal proceeding—is not only a traditional judicial duty but "the paramount responsibility of a judicial officer." (*In re Edward S., supra*, 173 Cal.App.4th at p. 412.) It is often difficult for a public or contract defender to forthrightly admit he or she provided a client deficient legal assistance; nor is it easy for such an attorney to withdraw from representation when not provided adequate support services, an act that may well cost a principled public defender his or her job or continuing government contracts. (*Id.* at p. 400.) Therefore, the right of indigent defendants to receive the assistance of counsel that is constitutionally required may well depend on the attentiveness of judicial officers to this issue.

 Quinn's testimony put the trial court on notice of a conflict of interest that may prejudice not just Jones, but many other indigent defendants in Lake County represented by contract public defenders obliged to share inadequate investigative or other support services. Such a conflict is different from the more conventional conflicts created when defense counsel has a personal conflict of interest (see, e.g., *People v. Singer* (1990) 226 Cal.App.3d 23 [275 Cal.Rptr. 911]; *People v. Jackson* (1985) 167 Cal.App.3d 829 [213 Cal.Rptr.

[10] (Other examples are *Duncan v. State of Michigan* (2009) 284 Mich.App. 246 [774 N.W.2d 89], app. granted by *Duncan v. State* (2009) 485 Mich. 1003 [775 N.W.2d 745]; *Kenny A. v. Perdue* (N.D.Ga. 2005) 356 F.Supp.2d 1353; *Lavallee v. Justices in Hampden Superior Court, supra*, 812 N.E.2d 895; *Nicholson v. Williams* (E.D.N.Y. 2002) 203 F.Supp.2d 153, 239–241, judg. vacated and cause remanded *sub nom. Nicholson v. Scoppetta* (2d Cir. 2004) 116 Fed.Appx. 313; *White v. Martz* (Dist.Ct., Jan. 25, 2006, No. CDV-2002-133) 2006 Mont. Dist. Lexis 136; *New York County Lawyers Assn. v. State* (N.Y.App.Div. 2002) 294 A.D.2d 69 [742 N.Y.S.2d 16]; *State v. Quitman County* (Miss. 2001) 807 So.2d 401; *Rivera v. Rowland* (Oct. 23, 1996, No. CV-95-0545629S) 1996 Conn. Super. Lexis 2800; *Platt v. State* (Ind.Ct.App. 1996) 664 N.E.2d 357; *In re Order on Prosecution of Criminal Appeals* (Fla. 1990) 561 So.2d 1130; *Luckey v. Harris* (11th Cir. 1988) 860 F.2d 1012, revd. on abstention grounds *sub nom. Luckey v. Miller* (11th Cir. 1992) 976 F.2d 673.)

521]) or represents clients with conflicting interests (*Holloway v. Arkansas* (1978) 435 U.S. 475 [55 L.Ed.2d 426, 98 S.Ct. 1173]; *Cuyler v. Sullivan* (1980) 446 U.S. 335 [64 L.Ed.2d 333, 100 S.Ct. 1708]), but it is comparable to the situation in which a public defender is "compelled by his or her excessive caseload to choose between the rights of the various indigent defendants he or she is representing" (*In re Edward S., supra,* 173 Cal.App.4th at p. 414). An accused person whose defense requires investigation is as prejudiced by the excessive caseload of the investigators the government provides as by that of the public defenders.

The danger of such a conflict, which bears upon the integrity of the judicial system itself, cannot be brushed aside. As noted, Quinn's statement that the 12 contract attorneys who represent indigent defendants in Lake County were provided only one investigator, whose services are as a practical matter unavailable to defendants accused of the nonviolent offenses charged in this case, was undisputed by the district attorney. Furthermore, the inadequate financing of public defender services and resulting lack of investigative resources for indigent defendants has been studied for decades and is no secret. The impact of the "investigator shortage" was pointed out by the ABA almost 30 years ago in a study that illustrated the problem by noting, among other things, that 14 attorneys in a division of the San Francisco Public Defender's Office were served by only two investigators, so that, "as the division's attorneys readily concede, cases either are not investigated or are inadequately investigated, and some cases that probably should be tried are concluded by plea bargains." (ABA Standing Com. on Legal Aid and Indigent Defendants, Criminal Defense Services for the Poor: Methods and Programs for Providing Legal Representation and the Need for Adequate Financing (May 1982) p. 37.)

By ignoring the investigative responsibilities of counsel, and therefore failing to inquire whether Quinn's conduct conformed to the appropriate objective standard of reasonableness, the court committed legal error. We reject the trial court's determination that Quinn provided Jones effective representation and instead conclude Quinn's representation of Jones fell below an objective standard of reasonableness under prevailing professional norms, in that he failed to (1) promptly investigate the availability of percipient witnesses, and (2) perceive the need for and obtain a qualified investigator to produce affirmative evidence that Officer Piccinini could not have seen Jones run the stop sign from the place at which he said he was located. To the extent Quinn's failure to seek investigative assistance was the result of the excessive caseload of the sole investigator made available to him by the county, Quinn's deficiency consisted of his failure to file a motion with the trial court requesting permission to withdraw from the case on that basis and to pursue appellate review if the motion was denied. (*In re Edward S., supra,* 173 Cal.App.4th at pp. 412–415.) Such a motion would compel the

responsible Board of Supervisors to "face the choice of either funding the costs of assignment of private counsel [or private investigators] and often, increasing the costs of feeding, housing and controlling a prisoner during postponement of trials; or of making provision of funds, facilities and personnel for a public defender's office adequate for the demands placed upon it." (*Ligda v. Superior Court* (1970) 5 Cal.App.3d 811, 828 [85 Cal.Rptr. 744]; accord, *In re Edward S., supra,* 173 Cal.App.4th at p. 414.) A public defender who believes there is a genuine basis upon which to make such withdrawal motion, but fails to do so, participates in the denial of his or her client's Sixth Amendment rights.

Having determined that Jones received ineffective assistance, we turn to the question whether he was prejudiced by Quinn's deficiencies.

## C.

### Quinn's Deficient Representation Was Prejudicial

Because the trial court, on remand, did not find ineffective assistance, it was not required to and did not conduct a new suppression hearing. However, after finding "there was not an adequate showing . . . of inadequate representation by Mr. Quinn to have justified the holding of a second suppression hearing," the court went on to observe that "having heard the evidence under the [Penal Code section] 1538.5 motion that's been presented this time around, the Court would order it would still be the same." In the trial court's view, "the evidence is not at all clear that the defense is correct that the officer couldn't have seen what he'd seen or what he testified that he saw, and therefore the [suppression] motion would have been denied by the Court given the new evidence that was presented." The trial court's reasoning is faulty.

To begin with, since it found that Quinn provided *effective* assistance at the first suppression hearing, the court's finding that it would make the same ruling at a second suppression hearing was entirely gratuitous,[11] and appears designed to insulate from reversal the conclusion that Jones received effective assistance, which we find plainly unjustified. The trial court's unexplained and unnecessary finding of no prejudice is not entitled to deference, because it is not a "basic, primary, or historical" fact as to which we must defer. As earlier explained (see discussion, *ante,* at p. 236), the prejudice as well as the

---

[11] As noted in *Strickland,* "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland, supra,* 466 U.S. at p. 697.) That was not, however, what was done in this case.

performance component of the *Strickland* test presents "a mixed question of law and fact" that we decide independently (*Strickland, supra,* 466 U.S. at p. 698; see *In re Marquez, supra,* 1 Cal.4th at p. 603.) The court's conclusory no-prejudice determination is not only unsupported by substantial evidence, but legally untenable.

■ The test of prejudice on Jones's claim of ineffective assistance of counsel is *not* whether, after a suppression hearing yet to be held, Jones's motion would be denied if based on the same evidence he produced at the hearing on ineffective assistance. As stated in *Strickland*, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." (*Strickland, supra,* 466 U.S. at p. 693.) "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Id.* at p. 686.) Therefore, all Jones must show is "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[12] (*Strickland, supra,* 466 U.S. at p. 694; see *In re Neely, supra,* 6 Cal.4th 901, 909.)

Our confidence in the outcome of the 2006 suppression hearing is substantially undermined by Quinn's several investigative failures and the evidence Biggs produced showing Piccinini could not have seen Jones roll through the stop sign. Lacking confidence in the denial of Jones's motion to suppress, we find a reasonable probability that, but for Quinn's unprofessional errors, the result of the 2006 hearing would have been different. We therefore grant Jones's request that we remand the case for a new suppression hearing.

---

[12] Although we rely on the conventional guidelines regarding prejudice, the inadequacy of investigative resources provided contract public defenders by Lake County arguably eliminates Jones's need to demonstrate prejudice. As explained in *Strickland*, prejudice is presumed in certain contexts in which the state significantly interferes with counsel's assistance or counsel was otherwise prevented from assisting the accused at a critical stage of the proceedings. (*Strickland, supra,* 466 U.S. at p. 692, citing *United States v. Cronic* (1984) 466 U.S. 648, 659 & fn. 25 [80 L.Ed.2d 657, 104 S.Ct. 2039]; accord, *Hurrell-Harring v. State of New York, supra,* 930 N.E.2d at p. 225.) The effective denial of investigative assistance to a class of accused persons certainly constitutes state interference with counsel's assistance. It is "reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice" where there is such interference not only because the government created the problem, but also due to "the ability of trial courts to make early inquiry." (*Strickland,* at p. 692.) It may also be that "[p]rejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost." (*Hurrell-Harring v. State of New York, supra,* 930 N.E.2d at p. 225, citing *United States v. Cronic, supra,* 466 U.S. at p. 658.)

## DISPOSITION

Jones's conviction in case No. CR908439 is vacated and the case remanded to the Presiding Judge of the Lake County Superior Court with instructions to assign a member of his court, other than the judge who has previously conducted the proceedings in this case,[13] to hear and determine Jones's second motion to suppress. If the judge to whom the matter is assigned determines to deny that motion, the judgment of conviction shall be reinstated. If the judge determines to grant the motion, the conviction in the aforesaid case should be permanently vacated and that case reset for trial. If Jones's conviction in case No. CR908439 is ultimately set aside or other good cause appears, Jones's sentence in case No. CR908705 should be reconsidered.

Lambden, J., concurred.

**HAERLE, J.,** Dissenting.—I respectfully dissent. I do so because the majority essentially overlooks the relevant standards for our review of a fact-based decision such as that rendered by the trial court in this matter and, additionally, disregards the substantial evidence—both testimonial and photographic—supporting the trial court's ruling that there was no ineffective assistance of counsel.

A. *The majority effectively ignores the relevant standard of review*

To me, the most notable feature of the majority's opinion is that it effectively gives only lip service, rather than adherence, to the applicable substantial evidence standard of review. That standard in a case such as this is whether—after our 2008 remand to the Lake County Superior Court—that court correctly ruled, after two days of receiving evidence in 2009,[1] that there was no ineffective assistance of counsel in the course of its prior hearings on appellant's motion to suppress. As abundant authority makes clear, such a ruling must be affirmed by an appellate court if the factual bases are supported by substantial evidence.

There are two parallel lines of authority regarding an appellate court's review of a lower court's finding of no ineffective assistance of counsel. The

---

[13] We do not issue this direction because we doubt the objectivity and fairness of the judge heretofore assigned this case, but because his statement that the evidence produced by Jones at the 2009 hearing would not induce him to change his 2006 denial of Jones's initial suppression motion might cause a reasonable person aware of the facts to doubt his ability to be impartial at the rehearing of the suppression motion.

[1] The trial court heard testimony for only two of the three days noted in the majority's opinion. At the close of the second day, July 27, it recessed the hearing so it could "rereview some of the transcripts" of the testimony it had received over those two days. It then announced its decision on August 31, 2009.

first—although perhaps the least important for present purposes—is the principle enunciated by the United States Supreme Court that "a defendant alleging a Sixth Amendment violation must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*Mickens v. Taylor* (2002) 535 U.S. 162, 166 [152 L.Ed.2d 291, 122 S.Ct. 1237], quoting *Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 104 S.Ct. 2052].)

Our Supreme Court has consistently articulated the law similarly, holding that in evaluating a defendant's claim of deficient performance by counsel, there is a " 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' [(quoting *Strickland*)], and we accord great deference to counsel's tactical decisions. [Citation.] Were it otherwise, appellate courts would be required to engage in the ' "perilous process" ' of second-guessing counsel's trial strategy. [Citation.] Accordingly, a reviewing court will reverse a conviction on the ground of inadequate counsel 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 979–980 [77 Cal.Rptr.2d 25, 959 P.2d 183], and cases cited therein, overruled on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].) It is, as that court has noted several times, a *defendant's burden* to establish ineffective assistance of counsel. (*People v. Lucas* (1995) 12 Cal.4th 415, 436 [48 Cal.Rptr.2d 525, 907 P.2d 373]; see also *People v. Duvall* (1995) 9 Cal.4th 464, 474 [37 Cal.Rptr.2d 259, 886 P.2d 1252].)

However, this principle addresses only the general standard of review, i.e., is there enough on the record to require sending the case back for a hearing regarding the alleged ineffective assistance of counsel? We decided there was here, did so, and Judge Mann conducted such a hearing in 2009. Thus, more important here than the authorities just noted is our standard of review regarding this trial court's ruling after those two days of hearing.

Our Supreme Court summarized that standard of review in *In re Avena* (1996) 12 Cal.4th 694, 710 [49 Cal.Rptr.2d 413, 909 P.2d 1017] (*Avena*). In that case, the court had earlier issued a writ directing a specially appointed trial court to review the record in the first degree murder/death penalty case, and determine if there had been ineffective assistance of counsel in the petitioner's first counsel's failure to investigate and present evidence of diminished capacity. The trial court did so, and found none. The Supreme Court affirmed based on its determination that the trial court's conclusion was supported by substantial evidence. It stated in that regard: "As a general matter, ' "[t]he referee's conclusions of law are subject to independent review, as is his resolution of mixed questions of law and fact. [Citations.] . . . The referee's findings of fact, though not binding on the court, are

given great weight when supported by substantial evidence. The deference accorded factual findings derives from the fact that the referee had the opportunity to observe the demeanor of witnesses and their manner of testifying." [Citations.]' [Citations, including two stressing that referees can observe demeanor of witnesses.] [¶] We emphasize that, because petitioner seeks to overturn a final judgment in a collateral attack, he bears the burden of proof. [Citation.]"[2]

In *Avena*, the court cited numerous of its prior holdings to the same effect. (See, in particular, *In re Hitchings* (1993) 6 Cal.4th 97, 109–110 [24 Cal.Rptr.2d 74, 860 P.2d 466]; *In re Jackson* (1992) 3 Cal.4th 578, 585 [11 Cal.Rptr.2d 531, 835 P.2d 371], disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 545, fn. 6 [37 Cal.Rptr.2d 446, 887 P.2d 527]; *In re Marquez* (1992) 1 Cal.4th 584, 603 [3 Cal.Rptr.2d 727, 822 P.2d 435].) And subsequently, it has ruled similarly to *Avena* and, in so doing, specifically cited that decision. (See *In re Visciotti* (1996) 14 Cal.4th 325, 351–352 [58 Cal.Rptr.2d 801, 926 P.2d 987].)[3]

I regret that none of this authority is effectively considered in the majority's opinion which finds, contrary to the trial court, ineffective assistance of counsel by Attorney Thomas Quinn. Contrary to the majority, I would affirm the trial court because I believe the factual bases for its ruling are clearly supported by substantial evidence, specifically the two types of evidence I will discuss in the following part.

Before doing so, however, I think it appropriate to address the majority's obvious unhappiness with what it labels as a "conflict of interest" (maj. opn., *ante*, at p. 241) involving the apparent inadequate provision of investigators in both Lake County and elsewhere in the nation where there are "attempts to address such systematic deficiencies in public defender programs." (Maj. opn., *ante*, at p. 240.) I agree that, as this court discussed in *In re Edward S.* (2009) 173 Cal.App.4th 387, 412–415 [92 Cal.Rptr.3d 725], such a problem exists and that appropriate steps need to be taken at all governmental levels to attempt to correct it. However, those appropriate steps *do not* include

---

[2] The point regarding the ability of a referee (or, here, the trial court) to observe the demeanor of witnesses, a point repeated often in our Supreme Court's rulings regarding the standard of review, *is particularly relevant here.* Judge Mann observed not only Attorney Quinn, but his former client Charles Thomas Jones, the latter's girlfriend, Westphal, and the other witnesses, including Jones's friend, Sutch. Perhaps he believed Quinn's version of the 2006 events not only because of the substance of his testimony, but also because of the comparative demeanor of the witnesses on the stand.

[3] The Attorney General's brief to us relies on both of these standards of review.

reversing a trial court which, after a two-day hearing which included numerous witnesses and exhibits, determines that a preponderance of evidence was *not* produced showing ineffective assistance of counsel.

Put another way, the majority's reversal of a substantially fact-based ruling by a very experienced trial judge that there was no ineffective assistance of counsel four years ago in a hearing on a motion to suppress is, in my opinion, an entirely inappropriate remedy to the "conflict of interest" of "systematic deficiencies" problem the majority laments.

Now to the evidence I believe clearly meets our standard of review.

B. *Substantial evidence clearly supports the trial court's ruling*

The two most significant items of "substantial evidence" are (1) Attorney Quinn's own statements and testimony[4] regarding what he did with respect to the suppression motion in 2006 and (2) the pictures near and of the relevant intersection which were introduced into evidence at the 2009 hearing *by appellant Jones*, the import of which is totally ignored by the majority.

First, regarding Quinn's prehearing declaration and testimony: In an initial declaration submitted with the suppression motion, Quinn related that he served as counsel for Jones from March 2006 until he was replaced a year later by Steve Tulanian, when he turned his case files over to Tulanian. With a lapse of three years since the events in question (i.e., the period that had elapsed between the 2006 suppression hearing and the 2009 hearing on the ineffective assistance of counsel issue), and because it had been two years since he had seen the relevant files,[5] his recollection was "somewhat limited," but he was aware from the appellate opinion in this case that his performance was challenged for his not calling witnesses at the suppression hearing. He recalled filing the motion and preparing by interviewing his "clients,"[6]

---

[4] Even if not all of Quinn's testimony provided support for the trial court's ruling (as the trial court possibly implied by its reference to "that portion of [Quinn's] testimony"), such is not the standard. Substantial evidence may be found in "only part of a witness's testimony." (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 830 [15 Cal.Rptr.3d 876]; see also *People v. Hrisoulas* (1967) 251 Cal.App.2d 791, 796 [60 Cal.Rptr. 80]; *In re Marriage of Calcaterra & Badakhsh* (2005) 132 Cal.App.4th. 28, 36 [33 Cal.Rptr.3d 246].)

[5] From his testimony at the 2009 hearing and a supplemental declaration filed thereafter, it appears clear that Quinn did not have access to these files until *after* that hearing had concluded.

[6] "[C]lients" included Westphal, who was apparently a codefendant in the second case.

visiting the stop scene, taking photographs, and attaching some, plus others provided by the codefendant girlfriend, as exhibits to the motion. He recalled Jones giving him at least one name, Samantha Sutch, but was unsure whether this was before the motion. He distinctly recalled asking Jones at the hearing whether he had brought any witnesses with him, and Jones saying he had not.

Quinn declared that eyewitness testimony about the stop certainly would have been "powerful evidence," combined with his defense argument that an officer could not have seen Jones's vehicle, and he "surely should have" noted and investigated any such witnesses he knew about before the hearing. But the only recrimination from Jones that Quinn recalled at or after the 2006 hearing was for not using color copies of the photographs to cross-examine an officer.

Specifically, Quinn recalled no complaints, or even comments from Jones, about uncalled witnesses. Jones was out of custody after that, on a time waiver, and Quinn's best recollection was that Jones made no issue about uncalled witnesses until early 2007, as the prospect of going to trial grew imminent. Quinn could not say whether Jones gave him information about Sutch then or earlier, but Quinn did contact Sutch by phone at that point. She told him that she and another person were behind Jones's vehicle and saw Jones make a complete stop. Quinn did not intentionally fail to contact or call witnesses. Nevertheless, he considered it "entirely possible" that he neglected to timely do so, given the press of business and his limited experience with suppression motions.

On the first day of the 2009 hearing, Quinn elaborated on that issue. When he got the case in early 2006, he had been a contract public defender for Lake County since 2003, and had some prior criminal practice experience as well. He obtained discovery in this case and realized that suppression could be "the linchpin in both cases," for fruits of the traffic stop in the first case had contributed to a warrant search of Jones's residence that produced the charges in the second case. He interviewed Jones and also Westphal, who was motivated to help out in both cases. He discussed the police report with Jones, who apprised him of the odd configuration of the intersection and that he felt the traffic stop was a pretext to catch him with contraband.

Since Quinn lived in that specific area of the county and was familiar with it, he determined to investigate himself rather than use the single investigator then available to the office. He walked the scene himself, took photographs, and observed the terrain and configuration of the intersection. He realized that, while differences in the time of year, amount of foliage, and other

matters could affect the argument, there was an issue of whether an officer could see whether a vehicle rolled through the stop sign, particularly from the vantage point mentioned in the police report.

Westphal did "an excellent job herself" and took good photographs of the area. Between them, they had two or three dozen pictures and, regarding checking the intersection and the circumstances of the stop of Jones's vehicle, Quinn felt that he and Westphal had investigated "thoroughly." He attached about nine color photographs as exhibits to the suppression motion, which he filed after unsuccessful efforts to get a "decent offer" and after difficulty in getting Jones free on bail. Quinn did not remember anyone named Marty Franceschi testifying at a bail hearing (Pen. Code, § 1275),[7] or Jones giving him the name or phone number of a witness at the arraignment.

Quinn felt sure there were observers at the suppression hearing, but none that were remarkable. When he asked Jones whether he "brought his witnesses," Jones said "no." He asked because he recalled Jones mentioning having a couple of witnesses and he and his wife bringing them. Quinn did not recall knowing the names or any contact information for witnesses; nor did he recall seeking a continuance. Jones did not chide him then for not calling witnesses. The first such complaint came months later, as the trial loomed. Again, Jones's only criticism of Quinn at the 2006 hearing was that the latter had not used a color copier to copy the photographs he used to cross-examine the officer.

Several of the numerous photographs Quinn and Westphal took were marked and offered and admitted into evidence without objection at the 2006 hearing, and then used by Quinn in his cross-examination of Officer Greg Piccinini.

At the 2009 hearing, the court took judicial notice of the transcript of the 2006 hearing. It shows that Quinn used the photographs to—very effectively, I believe—cross-examine Officer Piccinini on Piccinini's testimony that he saw Jones's vehicle go through the stop sign at about five miles an hour. Specifically, Quinn got Piccinini to admit, among other things, that (1) he was in his police car in the area because he wanted "to see where [Jones's] vehicle was going"; (2) Sergeant Celli just happened to arrive "a minute or two after . . . [he] had stopped [Jones]"; (3) he nowhere included in his report anything regarding Jones appearing to be under the influence of drugs ("being

---

[7] The name is variously spelled in the transcripts as Francheski, Franceschi, or Francesky.

11550")[8]); and (4) he did not stop Jones's car until it was "a hundred, a hundred and fifty yards" beyond the critical stop sign.[9]

Quinn also cross-examined the People's second witness, Officer Timothy Hobbs, who arrived on the scene only after the arrest and search. Quinn did not call Jones or other witnesses; he explained that he was generally reluctant to call a defendant at a suppression hearing, for reasons of self-incrimination.

Despite noting some lack of memory because of the passage of three years, Quinn did rely on the customs of his practice of law. He recalled communicating often with Jones and, when the latter was out of custody, following a usual practice of speaking with him, Westphal, or Jones's mother, before each hearing. Had there been percipient witnesses present at the suppression hearing, for example, "surely, I mean—and they're right there in the courtroom, I would have called them, . . . absolutely." "I mean, there's just no reason whatsoever I would not do that." As for the idea that Jones complained about his not calling witnesses, Quinn stated: "You know, if somebody keeps raising an issue or keeps calling me about something, it's going to tend to stick in your mind more than, you know, say, something somebody tells you at a court appearance and then you don't hear from them for a month . . . ." Upon learning from Sutch in 2007 that she claimed to have been with someone right behind Jones at the stop sign, Quinn was troubled and explored ways to correct the omission. However, he was soon replaced by new counsel, Tulanian.

Quinn testified on the first of the two days of testimony at the remand hearing, but at that point in time he had been unable to review the files he had already turned over to Tulanian. He expected to find Sutch's name in the file, for he recalled writing it down when he finally spoke with her; however, he did not expect this to illuminate *when* he became aware of the information.

Quinn got access to his file later and filed a supplemental declaration that was placed in evidence at the second hearing date.[10] In it, he explained that

---

[8] The reference is, of course, to the violation specified in Health and Safety Code section 11550.

[9] As the foregoing commentary suggests, I disagree with the majority's labeling of these photographs as "poorly authenticated and inadequately interpreted" photographic evidence produced by Quinn at the 2006 suppression hearing. (Maj. opn., *ante*, at p. 239.) In the first place, there was no objection to the introduction of the three photographs and thus no need for "authentication." Secondly, Quinn apparently got the answers he wanted from Piccinini regarding them.

[10] Tulanian, who had the files, remained Jones's trial counsel through the first day of the remand hearing. He died unexpectedly before the second hearing date, but Quinn reviewed the file about a week before Tulanian died.

he found "the phrase 'Samantha Sutch & Marty' written at the top of a page containing notes from before the time of the hearing on the suppression motion in July 2006, although a description of the substance of their projected testimony is part of an entry dated from March 2007[,] well after that hearing was held." I think it is totally logical to assume that the (very experienced) trial judge assumed that Quinn did, indeed, have a duty to investigate thoroughly, but also assumed that he never learned about these people from his interviews with Jones and Westphal. Further, nothing in this record suggests that Quinn could have learned about them any other way. Thus, I submit that there was and is no legal basis to justify a finding of an inadequate investigation because of Quinn's failure to locate and interview Sutch and "Marty."

On this specific subject, the trial court stated: "The issue seems to then revolve around whether or not [Quinn] knew about and failed to call the defense witnesses that—the name's [*sic*] came up, Samantha Su[t]ch, and Marty Francesky. [¶] *The evidence that I've heard preponderates in favor of Mr. Quinn that he did not know of these witnesses.* I'm struck by the fact that Mr. Quinn testified that there would have been no reason for him not to call them if they were there and he knew about them. And I think that's a correct statement. I'm sure that he would have called them. *I believe that portion of the testimony that he did not know about them.*" (Italics added.)

My appellate court colleagues who, like me, saw neither Quinn nor Jones on the witness stand, opt to interpret—indeed, find—that the facts are 180 degrees in the opposite direction. They hold that: "The conflicting testimony of Jones and Quinn as to when[11] the former told the latter about the percipient witnesses, which the trial court considered the dispositive fact, is really beside the point. Quinn had a duty to inquire whether Jones's testimony could be supported by others *regardless of whether Jones came forward with this information.*" (Maj. opn., *ante*, at p. 239, original italics.)

This statement strikes me as a most unfair dismissal of a very pertinent factual finding of the trial court. That finding, quoted above, is both crucial and fully supported by substantial evidence, i.e., Quinn's testimony. The evidence before the trial court included Quinn's declaration stating that he *did* interview his clients in preparation for the suppression hearing. The trial judge must have both believed him and then concluded that (1) in fact those clients said nothing to him about any percipient witnesses (because there were none), (2) there was thus no need for an investigator regarding such

---

[11] I assume my colleagues mean "if and when."

witnesses because Quinn's clients would have been the only logical source for any information on that subject, and (3) as a consequence of the foregoing, the dearth of investigative resources is "not a major issue."

Finally regarding the testimonial substantial evidence, I disagree with the majority that ineffective assistance is established by Quinn's failure to use an investigator so as to better challenge the officer's ability to see Jones run the stop sign. (See maj. opn., *ante*, at p. 238 et seq.) Jones's own expert, Faulder, conceded that it was not necessary to use an investigator in every case, and Quinn thoroughly explained why he deemed his own investigation, plus employing some of Westphal's work, produced a thorough result. Faulder also argued, and the majority apparently agrees, that, in a case of this sort, it is unwise to have defense counsel act as his or her own witness. However, whatever those risks might entail in theory, several of the numerous photographs that Quinn and Westphal took—and, again, took without the aid or assistance of any investigators—were admitted into evidence by Jones's then counsel without objection as to foundation or on any other ground that might have required Quinn's testimony.

It is correct that Quinn presented his "visibility challenge" through those photographs without an investigator's testimony, but the majority identifies neither any flaws nor shortcomings in the photographs admitted into evidence that required amplification or explanation by a witness. The decision to use them alone as the impeachment vehicle was evidently tactical. "Since '[t]here are countless ways to provide effective assistance in any given case,' [citation], unless consideration is given to counsel's overall performance . . . , it will be 'all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.' [Citation.]" (*Kimmelman v. Morrison* (1986) 477 U.S. 365, 386 [91 L.Ed.2d 305, 106 S.Ct. 2574].) Thus, I perceive neither deficient performance nor apparent prejudice in the way Quinn used these photographs at the 2006 hearing.

But it is an *entirely different series of photographs*, offered by appellant Jones at the 2009 hearing and received by the trial court, which provides even more substantial evidence requiring this court to affirm the trial court's decision. Appellant's witness Biggs, an investigator (and also a bail bondsman), also took many photographs of the intersection at issue in 2007; no fewer than 14 of these were offered into evidence by appellant's counsel and received at the 2009 hearing.[12] I respectfully submit that these photographs

---

[12] The record shows that the trial court admitted 14 photographs into evidence during the second day of hearing, July 27, 2009. They were marked exhibits A through Q, except that exhibit J was not a photograph but, rather, a poster, and exhibits L and N were not received into evidence.

clearly constitute additional substantial evidence upon which the trial court could rely in finding, as it did, no ineffective assistance of counsel by Quinn, *specifically evidence that Jones could very well have been seen by Officer Piccinini not stopping at the stop sign at the corner of Park and Arrowhead.*

As the first witness in the 2009 hearing, Jones testified that the February 26, 2006, stop by Officer Piccinini was improper because "the limit line is so far back that once you stop at that stop sign, you can't see to go forward, so you [sic] got to stop at the stop sign. You [sic] got to roll forward a little bit to look down Park Street to make sure it's clear before you can go."[13] But, and rather remarkably, the multitude of pictures taken by appellant's witness Biggs of the approach to the stop sign on Arrowhead *show absolutely no limit line—not even a trace of one.* In and of itself, this could have allowed the trial court to discredit Jones's 2009 version of how and why he was improperly stopped by Officer Piccinini. Rather curiously, in my view, the majority nowhere even mentions this fact.

Also ignored by the majority is the fact that none of these 14 photographs shows even the slightest hint of a crosswalk, a rather understandable fact when one sees, via these photographs, what is clearly a *very* rural intersection. I assume—and wish my colleagues would also—that the trial court focused on this key (and separate) sentence in the Vehicle Code section the trial court found justified Officer Piccinini's stop of Jones's vehicle: "If there is no limit line or crosswalk, the driver shall stop at the entrance to the intersecting roadway. " (Veh. Code, § 22450, subd. (a).)

And there are several of Biggs's photographs which strongly suggest that, particularly at 9:30 p.m. on a February evening, it would have been very easy for Officer Piccinini to have observed, from his location a mere 30 yards[14] from the intersection of Park and Arrowhead, the headlights of a vehicle approaching that intersection but *not* stopping there.[15] This is particularly illustrated by another part of the evidence before the trial court but also ignored by the majority, exhibits I and K, especially the latter. Judge Mann

---

[13] Regarding the definition and function of a "limit line" before a stop sign, see Vehicle Code section 22450, subdivision (a).

[14] I.e. (just in case my colleagues have forgotten such relatively youthful items of interest), precisely the distance from home plate to first base.

[15] This is—and very significantly I think—confirmed by Piccinini's 2006 testimony that he was so close to the intersection that his "headlights actually illuminated the vehicle as it went through the intersection." I suggest to the majority that a legitimate conclusion for the trial court to draw from that statement was (and still is) that if Officer Piccinini was that close to appellant's car, he was also close enough to see that car not stop at the either the stop sign or the intersection itself.

had these photographs in the record before him when, after the close of the two days of testimony, he "rereviewed" that record in preparation to rule on August 31, 2009. I respectfully submit that Biggs's numerous photographs, combined with the testimony of Attorney Quinn and Officer Piccinini, constitute substantial evidence supporting the trial court's ruling that there was no ineffective assistance of counsel by Quinn at the 2006 hearing.