Filed 11/9/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br> v. <br><br> PATRICK SEAN O'HEARN, <br><br> Defendant and Appellant. | A158676 <br><br> (Marin County <br> Super. Ct. No. SC206592) |

Patrick Sean O'Hearn appeals from the denial of his motion to vacate a guilty plea to charges of making a criminal threat. Agreeing that he received ineffective assistance of counsel in the proceedings resulting in his plea, we will reverse and remand with directions for the superior court to conduct a trial on the charges.[1]

---

[1] As explained in our opinion in *In re O'Hearn* (Aug. 31, 2020, A160399 [nonpub. opn.]), court-appointed counsel initially filed a brief raising no legal issues and asking this court to independently review the record pursuant to *People v. Wende* (1979) 25 Cal.3d 436. Upon review of the record, it became apparent that appellate counsel filed the *Wende* brief not because denial of the motion to withdraw the plea was in his view legally unassailable, but rather because counsel who prepared and signed appellant's notice of appeal failed to request a certificate of probable cause as required by Penal Code section 1237.5, and rule 8.304(b) of the California Rules of Court for an appeal challenging the validity of a plea. As a result, the appeal appeared to be judicially non-cognizable. (Cal. Rules of Court, rule 8.304(b); *People v. Mendez* (1999) 19 Cal.4th 1084.)

1

*The Underlying Offense*

On October 19, 2018, approximately 11:30 p.m., the San Rafael Police Department responded to a report of O'Hearn acting erratically in the presence of Rachel D. and Sheryl C., elderly women who lived in the same apartment complex as O'Hearn. Officers Lara Gavlick and Anthony Scalercio met with O'Hearn in his apartment, with which they were familiar as they had been there on numerous occasions in connection with prior complaints of his aberrant conduct. O'Hearn denied participating in any altercation with the two women and "rambled about random topics and continued to say that everyone was lying." The arresting officers suspected O'Hearn had "mental health issues," and considered whether he was eligible for commitment under Welfare and Institutions Code section 5150 as a result of a mental disorder, but concluded he did not meet all of the criteria. The police report added that the San Rafael Police Department "has responded to this address for complaints against O'Hearn and his erratic behavior, which often include

---

After responding to questions we posed concerning available remedies, on July 2, 2020, O'Hearn filed a petition for writ of habeas corpus (case No. A160399), contending that filing the deficient notice of appeal constituted ineffective assistance of counsel and requesting that we remand and order the superior court to issue a certificate of probable cause. We issued an order to show cause why this relief should not be granted and, after considering the Attorney General's return and O'Hearn's traverse, issued an unpublished opinion granting the requested relief.

On September 1, 2020, the Marin County Superior Court issued a certificate of probable cause. The appeal challenging the denial of O'Hearn's motion to withdraw his plea is now properly before us.

[2] As there was no preliminary hearing and the police report is not included in the record, we take the facts from the probation report and the pleadings in support of and in opposition to O'Hearn's motion to withdraw his plea, all of which quote from the police report.

threats to his neighbors, on numerous occasions." Officer Gavlick noted that while she and Officer Scalercio were speaking with the two women, O'Hearn came outside his apartment and began yelling at them again.

During the police interviews with the women, Rachel D. expressed her frustration with having to live in the same apartment complex as O'Hearn. At the time O'Hearn confronted the women, Rachel was helping Sheryl move some items from her apartment. While they were in a stairwell, O'Hearn yelled obscenities at the women and threatened to kill them. The women then entered Rachel's apartment. A while later, they went to Sheryl's apartment to get her dog and take it for a walk. O'Hearn, who was then standing on a landing outside his own apartment, began shouting at them again, declaring: "I'm going to fucking kill you guys," and "I'm going to kick your ass." He then entered his apartment, slamming the door behind him, while continuing to yell: "I'm going to kill you guys." Rachel said she was terrified by O'Hearn, and Sheryl also expressed fear of him.

Officers Gavlick and Scalercio arrested O'Hearn for making criminal threats in violation of Penal Code section 422,[3] and violating conditions of probation granted in an earlier case.

### The Charges

On October 23, 2018, O'Hearn was charged by the Marin County District Attorney with violation of section 422. The complaint further alleged that the offense was a violent and/or serious felony within the meanings of both sections 1192.7, subdivision (c)(38) and 1170.12, subdivisions (a), (b), and (c), and that O'Hearn had been convicted of four prior felonies within the meaning of section 1203, subdivision (e)(4).

---

[3] All subsequent statutory references are to the Penal Code unless otherwise indicated.

3

At the arraignment the next day, O'Hearn was represented by a public defender. On November 1, 2018, after the public defender declared a conflict, the court appointed Robert Casper to represent O'Hearn. That same day, O'Hearn entered a plea of not guilty. Two weeks later, O'Hearn hired private counsel and the court relieved Casper, who returned the case file to O'Hearn. On November 15, Casper provided "discovery" related to the case to O'Hearn's new attorney, Manton Selby.[4] The "discovery" presumably contained the police report.

### Entry of the Guilty Plea

On December 3, 2018, represented by Selby, O'Hearn pled guilty to the making of criminal threats and admitted a probation violation in exchange for which two other probation violations were dismissed with *Harvey* waivers.[5]

However, as neither Selby, the prosecutor, nor the court appeared to realize, the form by which O'Hearn waived his constitutional rights and accepted the plea offer—defined in its caption as a "Disposition Commitment (*Cruz/Vargas* Waiver)"—was not signed by Selby, as required by the form waiver. Instead, O'Hearn signed not only on the line on the form designated for the "Defendant" to sign but also, and on the same date, on the line

---

[4] As later discussed, O'Hearn found Selby through marketing by the Calabria Law Group, located in Los Angeles, which counsel who replaced Selby described as a "defense aggregator" that sends cases to lawyers around the state, such as Selby, with whom it has contracts. At the hearing on O'Hearn's motion to withdraw his plea, Selby testified that he ceased representing O'Hearn (without seeking or apparently receiving court approval) due to a contract dispute with the Calabria Law Group. Selby did not think his abrupt departure without leave of court, inappropriate in any way because Calabria Law Group, which he considered primary or co-counsel for O'Hearn, had contracted with another attorney to replace him.

[5] *People v. Harvey* (1979) 25 Cal.3d 754.

designated for the signature of the "Attorney for Defendant." The plea form explains that the signature of counsel confirms counsel has "fully advised my client in the above-entitled matter as to his/her rights pursuant to the decisions of the California Supreme Court in *People v. Cruz* (1988) 44 Cal.3d 1247 and the California Court of Appeal in *People v. Vargas* (1990) 223 Cal.App.3d 1107; and *People v. Carr* (2006) 143 Cal.App.4th 786, and to the consequences of the Court finding a willful violation of the terms of this disposition agreement."

Selby never appeared again in the case. On January 29, 2019, O'Hearn appeared for sentencing with attorney Elizabeth Berg, who was apparently also brought into the case pursuant to a contract with the Calabria Law Group. (See discussion, *ante*, at p. 4, fn. 4.) The court sentenced O'Hearn to three years of felony probation, with a stay away order regarding both victims and the housing complex in which they resided, and numerous other conditions. Most salient for present purposes, as recommended by the probation department, O'Hearn was required to "submit to chemical testing at the request of any peace or probation officer to determine drug content or alcohol content of your blood [and] [p]articipate in treatment, therapy, and counseling as directed by Probation." The court also ordered that O'Hearn "[p]articipate in psychotherapy as directed by Probation." As a circumstance in mitigation of his offense, the presentence report noted that O'Hearn "has been diagnosed with bi-polar disorder and not taking his medication at the time of the instant offense." This is the earliest indication in the record O'Hearn suffered from a mental illness or disorder.

On February 21, 2019, the case was put back on the calendar by the public defender who, before again raising his conflict, advised the court that there might be grounds for O'Hearn to move to withdraw his plea. In

5

response to this advisement, Casper was reappointed to represent O'Hearn and investigate whether such grounds existed.

Subsequently, appellant made a *Marsden*[6] motion seeking to have Casper replaced as counsel, and Casper also asked to be relieved. At a hearing on April 3, in response to the court's earlier request that Casper investigate whether there were grounds upon which O'Hearn might move to withdraw his plea, Casper advised the court that he had looked into the matter and found no basis for such a motion. Casper told the court that he "went over [the transcripts of the pretrial proceedings] several times to see if there was any evidence of coercion or lack of understanding or O'Hearn not having been advised of a key right or something of that nature, and I didn't see anything. [¶] It appeared O'Hearn, on paper, understood the nature of his plea and freely and voluntarily chose to plead. I can't speak to what was in his mind, certainly. But, within the transcript, it appears that O'Hearn was properly advised. He did enter the appropriate waivers and entered a plea of guilty. And it appears that there was some kind of disposition where several charges, as well as a couple [of] probation violations, were dismissed in contemplation of the deal. [¶] So, in my, you know, view, I don't think there's a lawful basis to withdraw the plea on that basis that is, in terms of duress. And there was nothing that was related to me that caused me to change my mind other than what appears to be, as we see sometimes, buyer's remorse."

At the close of the hearing, the court denied O'Hearn's *Marsden* motion and granted Casper's request to be relieved. The matter was then again taken off calendar to provide O'Hearn time to determine whether he wanted to file a motion to withdraw his plea in propria persona "or find new counsel

---

[6] *People v. Marsden* (1970) 2 Cal.3d 118.

6

who can take a look at that transcript and disagree with Casper." On May 20, attorney Michael Coffino agreed to represent O'Hearn in filing a motion to withdraw his plea.

### *The Motion to Withdraw the Plea*

The motion to withdraw prepared by Coffino was based on the contention that the plea was the consequence of Selby's ineffective assistance. Specifically, the motion claimed that Selby "barely met with his client," made a single court appearance before the guilty plea, and then failed to attend the sentencing hearing, and at some point lost the case file, to the detriment of subsequent counsel and O'Hearn. Selby never explained to O'Hearn what the elements of potential defenses were, did not inquire about his extensive mental health history, did not advise him that the charged crime was a strike, and did not raise with O'Hearn or the prosecution any alternative to pleading guilty as charged.

In a declaration, Coffino stated that O'Hearn's 800-page medical record showed he had been hospitalized for mental health problems at Atascadero and Napa State Hospitals. And in 2019, O'Hearn had been admitted to Marin General Hospital, where it was noted that he had a history of schizophrenia and was diagnosed as currently suffering "psychosis and schizoaffective disorder." O'Hearn had been prescribed numerous antipsychotic and anticonvulsive medications and mood stabilizers. In April 2019, when he went to the emergency room of Marin General Hospital to refill a prescription for benzodiazepine, he was told to see a psychiatrist but became irritable and left without seeing the doctor or refilling the prescription.

According to the motion to withdraw, O'Hearn told Selby about his history of mental illness but Selby did not pass on this information to the

7

court or the district attorney, nor did he undertake any investigation of O'Hearn's history of mental illness.

Coffino also discovered and provided the court with State Bar records showing that Selby had been repeatedly found to have failed to provide his clients competent legal services. He was publicly disciplined by the State Bar four times for misconduct respecting his representation of clients and suspended from practice twice, in 2005 and 2011.

Coffino additionally learned that one of O'Hearn's victims, Sheryl C., had a criminal record with numerous arrests and convictions for crimes of moral turpitude, including providing false information to a peace officer, petty theft, and petty theft with a prior. Although the district attorney provided this information to Selby, who could have used it to for impeachment purposes, he had no recollection of it when Coffino spoke with him.

In his motion papers, O'Hearn argued that Selby "did not perform as a reasonably competent attorney at the guilty plea stage, in investigating the case, in negotiating a plea bargain, or in presenting mitigation evidence," and that an attorney in Selby's position "has a duty to conduct a reasonable investigation . . . in order to make informed decisions about how best to represent the client. (*Strickland v. Washington* [(1984) 466 U.S. 668], 691.) Failure to investigate the facts may constitute ineffective assistance. (*In re Hill* (2011) 198 Cal.App.4th 1008, 1017; *In re Edward S.* (2009) 173 Cal.App.4th 387, 407 . . . . Failure to investigate and present a mental state defense may also be ineffective assistance of counsel. (*Williams v. Taylor* (2000) 529 U.S. 362 . . . .)"

The motion emphasized that although O'Hearn had numerous convictions, most were misdemeanors and he had only once been convicted of

a violent offense. His history of making threats he never carried out, as in this case, indicated that Rachel D. and Sheryl C., who had interacted with him for many years, could not reasonably have believed they would imminently be injured, a matter that at the very least warranted investigation, as did Sheryl's credibility.

The deficiency in Selby's representation most heavily emphasized by the motion to withdraw the plea, was his failure to investigate O'Hearn's lengthy mental history. O'Hearn disclosed his mental history to Selby when the latter questioned his competence to stand trial, but Selby did not relate O'Hearn's mental health to the development of a defense. As the motion to withdraw pointed out, conviction of making criminal threats requires specific intent, which can be negated by a mental disorder, and section 28, subdivision (a) provides that "evidence of mental disorder is admissible on the issue of whether or not the accused actually formed a required specific intent . . . when 'a specific intent crime is charged.' " Although such evidence may be admitted only in a trial of guilt of a charged crime (in which sanity is conclusively presumed), and not in a trial on legal sanity (*People v. Elmore* (2014) 59 Cal.4th 121, 139–146), "[t]he bifurcated approach offers substantial benefits to the defense. At the guilt phase, the prosecution must prove beyond a reasonable doubt each element of the offense, including mens rea. The defendant has the opportunity to obtain an acquittal or a verdict on a lesser included offense, without having to claim insanity and risk the prospect of involuntary commitment for psychiatric treatment. The defense has available the panoply of strategies open to legally sane defendants, including unreasonable self-defense based on mistake of fact." (*Id.* at p. 144.)

As the motion to withdraw also emphasized, Selby made no effort to present any such evidence, which was abundant, either in court or in an

9

effort to negotiate a more favorable disposition. O'Hearn's recent diagnosis of psychosis and schizoaffective disorder, his use of antipsychotic medications, and his history of repeated psychiatric hospitalizations might have provided the basis of a successful defense to the charge. But voluminous medical records presenting this evidence went unused because Selby failed to conduct an investigation that would readily have disclosed it.

At the close of defense counsel's statement, the court asked him, "How do I know that Selby did not talk about the facts with O'Hearn? And assuming all that you have said is true, what's the evidence that no reasonable attorney would have acted as did Selby, resulting in a finding of ineffective counsel?" Counsel responded that the evidence of Selby's conduct was provided by (1) Selby's descriptions to present counsel of O'Hearn's bizarre behavior, which was set forth in a sworn declaration by present counsel; (2) the repeated discipline of Selby by the State Bar for conduct against the interests of his own clients; (3) the evidence, undisputed by the prosecution, that Selby "pled my client to the sheet without any effort to present mitigating evidence or negotiate a better settlement"; and (4) a complete failure to investigate O'Hearn's medical health history, showing that he was twice confined to state mental hospitals and was recently "5150'd . . . and then 5250'd [certification for intensive treatment] right after that because the doctor said that he required acute inpatient psychiatric hospitalization and that he had a grave disability." Counsel maintained that he did not "need an expert to tell the court that the *Strickland* standard . . . was violated in this case" and pointed out that the prosecution did not genuinely contest the claim of ineffective assistance of counsel; its main argument was that O'Hearn "got a good deal," to which defense counsel

10

answered that "no deal is a good deal if you have a defense to a major charge."

At the hearing on the motion, the trial court allowed that Selby's conduct "seems to be something that wouldn't normally happen with a 422 charge, that 422 charges like this are oftentimes negotiated down to a non-strike, and it seems a little—his conduct seems a little suspect to me." On the other hand, the court noted that it had heard only from O'Hearn, which might be unfair to Selby.

At that point, defense counsel offered to supplement the evidence provided by securing Selby's direct testimony. A hearing for that purpose was conducted on September 24, 2020.

### Attorney Selby's Testimony

Aware of the court's concern about his departure from the case without requesting permission, Selby testified that he did not personally seek leave of the court to terminate his representation of O'Hearn because "[t]he law firm that was hired was the Calabria firm. They set a fee, and they were paid. They signed a contract. I was handling the firm [*sic*] as the attorney assigned to that case." After O'Hearn entered his plea but before he was sentenced, a dispute arose between Selby and Calabria stemming from Selby's refusal to take case assignments in San Mateo and Santa Clara Counties, not just Marin, as Calabria desired. Selby also felt it unnecessary to seek leave to depart from the case because he knew that after he terminated his relationship with the firm, his cases would be turned over to other attorneys affiliated with Calabria Law Group.

Selby was unable to remember whether he met with O'Hearn once or twice, and lost the case file without having made a copy. He did not give O'Hearn a copy of the police report but communicated to him its substance;

11

he acknowledged that O'Hearn was adamant the victims had walked past him rather than him approaching them as indicated in the report. Selby did not read any jury instructions to O'Hearn and only "partly" explained the elements of section 422 to him in explaining why the offense was a felony despite O'Hearn's feeling that it was equivalent to his prior offenses, most of which were misdemeanors.

Selby admitted he did not "undertake any investigation in this case" and simply conveyed to O'Hearn the district attorney's offer. He did not ask the prosecution to allow O'Hearn to plead to a misdemeanor because O'Hearn had so many misdemeanor priors that it would be "absurd" to "ask for something that would make me look idiotic in the eyes of the district attorney's office." The only lesser offense he may have discussed with the district attorney's office was a misdemeanor probation violation. "[The District Attorney] was not interested at that time in talking about it" but "[i]t may have come up later."

Asked whether he ever spoke to O'Hearn about his mental health history, Selby stated that he had, and that he had "at least an initial concern . . . that [O'Hearn] would not be competent," but "I determined that was not correct, that he was competent to proceed." They did not discuss "whether there were mental defenses . . . because that would come up later after the prelim." Selby's doubts about O'Hearn's competency arose from "[t]he fact that he had committed multiple offenses at the same location against multiple victims, in some cases the same victims, and that they all involved being out of control, at least raises a suspicion; so when I met with him, I wanted to find out that in my mind he was competent to proceed." Selby's concern was that O'Hearn "was able to understand what he was charged with, make appropriate decisions, and cooperate with me; and I determined

12

that to my satisfaction." Asked whether he made "any efforts to obtain O'Hearn's mental health records," Selby answered "No."

Selby told O'Hearn section 422 was a strike under the Three Strikes law but did not tell him that he would have to serve an executed sentence in state prison. Asked how he explained to O'Hearn the defenses to a section 422 charge, Selby said, "[w]e talked about it in a number of contexts, one of which was the facts that he related to me and that were confirmed in the police report that could be defensible, depending on some other things." Asked, what happened on December 3, when O'Hearn walked out of the holding cell into the courtroom in which the preliminary hearing was to take place, Selby stated that "as he walked out he said, 'I want to take the deal.'"

Selby told O'Hearn about the plea deal during their discussion at the jail.[7] O'Hearn previously called Selby "a lot of times when I wasn't in the office," but sometimes he was there and he and O'Hearn "discussed different aspects of the case," "including his relationship with his father," and Selby talked to his father "a couple of times." Selby did not testify that he told O'Hearn about an offer from the district attorney during any phone conversation prior to their meeting at the jail. Asked whether it was possible that, as O'Hearn said, Selby met with him face-to-face only once, at the jail, Selby answered that that was "possible." To the question "So in that one

_____

[7] This discussion must have taken place on December 3, the day scheduled for the preliminary hearing at which O'Hearn entered his guilty plea. The testimony of O'Hearn and Selby is confusing as to whether they met face-to-face previously on November 15, the date O'Hearn's prior counsel, Casper, was relieved and gave Selby his case file, and the court set bail at $50,000. The district attorney states in passing in her declaration that "[o]n November 15, 2018, defendant appeared out of custody with attorney Manton Selby." But Selby could not have discussed the plea offer with O'Hearn on November 15, even if O'Hearn met that day with Selby, because Selby did not receive the offer from the district attorney until November 29.

13

meeting, are you saying that you talked to him about the facts of the accusation against him, the elements of the crime, and the offer that the DA had communicated to you?" Selby responded: "Correct."

On cross-examination, Selby agreed with the district attorney that he received her offer before he met with O'Hearn in jail and that the gist of "the deal was that he was getting out on the day of sentencing." Nevertheless, Selby was "surprised when O'Hearn said that he wanted to take the deal," because "from the time he said he didn't want to take it, until we came to court, there'd been no suggestion by him that he might take a deal, or as normally occurs, where he would want to get me to sweeten it a bit. There was none of that at all."

Asked by the district attorney whether he went over the plea form with O'Hearn, Selby stated that he had, "and we filled out the plea form while other matters were being handled."[8] Selby also testified that he did not believe O'Hearn was under any sort of duress when he entered his guilty plea, and that in his experience the only thing unusual about this case was that there had "been a flat-out-non-interest in a plea and then walking out of custody and wanting to accept the offer." Asked how long he had practiced criminal law, Selby answered "52 years."

### O'Hearn's Testimony

O'Hearn testified that after he was arraigned and posted bail he received a letter at his apartment from an organization in Los Angeles called the Calabria Law Group offering to provide him legal help. Though he later

---

[8] As earlier noted, the trial court, the district attorney, and defense counsel all appear to have been unaware Selby did not sign the plea form. The fact that Selby failed to sign the form and O'Hearn signed it not only in his own behalf but also in behalf of Selby, suggests Selby did not go over the form very closely with his client.

realized it was a mistake, he was so "desperate to get some real legal help" that he called the number provided in the letter and explained to an unnamed person that he had a court date in a few days and needed to speak to someone very soon to "explain the whole situation." After the person on the phone said the Calabria firm would help, he "hired" the firm and was told he would be contacted before the court date. Nobody did contact him then, however, and no one from the Calabria Law Group appeared at the preliminary hearing, requiring that hearing to be rescheduled for the next day, with O'Hearn remanded and placed in jail overnight.

O'Hearn stated that he met with Manton Selby for the first time at the preliminary hearing the next day. They met in the visiting room of the jail and spoke for "[a]bout 10, maybe 15 minutes" immediately prior to the hearing. At no point during that discussion did Selby speak with him about the evidence or any defense; nor did Selby show him a copy of the police report, or describe the content of that report, or the criminal complaint. According to O'Hearn, Selby "basically ran over the important charge, the terrorist threat, and that was about it, and basically, I knew at that point that it was probably out of his league, and it was a bad situation."

Asked what happened at the preliminary hearing, O'Hearn said: "A deal was thrown at me," meaning that "there was a deal that was set up." Asked whether Selby ever explained possible defenses there might be to the charge of criminal threats, or if Selby had asked him to provide his account of what had happened, O'Hearn answered, "No."

O'Hearn testified that he did not know that the offense to which he pled guilty was a strike until after he entered the plea. Asked whether he would have pled guilty to the offense if he had then known it was a strike, O'Hearn said, "I don't believe I would have, but the situation was so out of control, I

15

can't say for sure." O'Hearn was not told by Selby that if probation was revoked he might have to serve time in state prison, because that subject was not discussed. O'Hearn also testified that Selby never asked him about "evidence regarding the credibility of the woman who brought the charges against him," and never asked any questions about his mental health history. The day he pled guilty was the last day O'Hearn ever saw Selby.

On cross-examination, O'Hearn admitted his criminal history "began in the 1980's," that he had previously pled guilty and reviewed plea forms with his attorney and knew he had the right to ask for time if he needed; though he said he had never been under as much "duress" and "stress" when presented with a plea form as he was in this case. O'Hearn also admitted that he had been charged with violation of section 422, 13 years ago, but was convicted instead of "attempted extortion," a nonviolent offense.

After O'Hearn entered his plea, he phoned Selby from jail "at least 10 or 12 times" but "wasn't able to get ahold of him." He only spoke with Selby on the phone once, and that was after he was sentenced.

On redirect, O'Hearn testified that on the previous occasions on which he entered guilty pleas and signed a plea form, his attorneys gave him copies of the police reports and he had "much more time to speak with them."

In subsequent testimony the next day, O'Hearn reiterated that he never received the police report from Selby and Selby never told him what was contained in the report. Nor did he ever speak with Selby before the day he entered his guilty plea. The only time he and Selby met face-to-face prior

16

to the preliminary hearing was on November 15. The meeting lasted 15 minutes "at most," and Selby did not at that time discuss any plea offer.[9]

### *The Ruling of the Trial Court*

The trial court prefaced its ruling with the observations that "the manner in which [O'Hearn] was represented was not ideal," referencing "this Calabria [Law Group's] practice of soliciting business from Southern California and having contractor's fill in. . . . I would say it's a bad practice that may have resulted in the records not being kept in a single place [and] Selby thinking he was just an employee of this practice and that they were the attorney of record. Nonetheless, the court concluded that the "failures articulated in the motion aren't borne out by any measure of evidence based on the testimony of Selby." The court conceded that "there could have been additional evidence to iron out when Selby actually visited the defendant in the jail, whether it was before or after the offer that was given by [Deputy District Attorney] Lamb. I considered even suggesting that you can get that, but ultimately concluded that even if the meeting was before the offer from [the deputy district attorney], that could be a mistake an attorney could make; and I have no reason to disbelieve Selby's representation that he advised the defendant prior to the date of the preliminary hearing of the offer, and the defendant came in wanting to change his mind.

"The defendant got a decent deal with quite a number of dismissals on the positive side, and I don't find any reason to disbelieve Selby's representation that he advised the defendant that it was a strike he was pleading to, that he went through all the facts with him in the police reports,

---

[9] The district attorney stated in a declaration that she conveyed the offer to Selby on November 29, four days before Selby disclosed it to O'Hearn the day he entered his plea.

17

although not reading them to him, and that he told him what was required in terms of proof.

"So assuming that Selby made some mistakes, the court's not in a position here, hearing what I heard, to conclude as a matter of law, that those fell below any particular standard of care.

"Perhaps an expert might have been able to articulate that, persuade the court that his behavior fell under a reasonable standard of care, but I'm not finding that Selby's conduct fell below a reasonable standard of care in the industry, notwithstanding what I said about it not being ideal.

"I think more importantly, I don't think there's any proof by any measure, certainly not clear and convincing, that the defendant would not have pled guilty had Selby done what Coffino suggests he should have done in the 10 days between the not guilty plea and the preliminary hearing date, which obviously is a short period of time, and a lot of people do plead guilty in that short period of time.

"So based on all of those reasons, the motion to withdraw the pleas is denied.  The plea will stand."

## DISCUSSION

To demonstrate ineffective assistance of counsel, a defendant must show that counsel's performance was inadequate when measured against the standard of " 'a reasonably competent attorney,' " and that counsel's performance "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland v. Washington, supra,* 466 U.S. at pp. 686–687.)  "In determining whether counsel's performance was deficient, a court must in general exercise deferential scrutiny" and "view and assess the reasonableness of counsel's acts or omissions . . . under the circumstances as they stood at the time . . . ."

18

(*People v. Ledesma* (1987) 43 Cal.3d 171, 216.) "[C]ourts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

The chief issue in this case is not whether Selby timely advised O'Hearn of certain rights and the nature of the charged offense, the issues the trial court dwelt upon, as to which there was some conflicting evidence. The dispositive question is more fundamental and involves no conflicting evidence: Did Selby's admitted failure to investigate either his client's mental health or the facts and circumstances of the charged offense (which could have supported defenses to the charge), despite having been told of O'Hearn's prior mental problems and having his own immediate doubts whether O'Hearn was competent to stand trial, render Selby *unable* to provide the advice required of " 'a reasonably competent attorney' " and "undermine the proper functioning of the adversarial process." Given the trial court's awareness of O'Hearn's long history of aberrant behavior and mental illness, the trial court's indifference to Selby's admitted failure to investigate the connection between the behavior and the illness, and the legal significance of this information, is inexplicable.

A defendant seeking relief on the ground of ineffective assistance of counsel must establish not just "that 'counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms,' " but as well " 'that there is a reasonable possibility that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Ledesma, supra,* 43 Cal.3d at pp. 216–218.) As we pointed out in *People v. Jones* (2010) 186 Cal.App.4th 216 (*Jones*), "the question is not what the ' "best lawyers would have done," ' nor

19

' "even what most good lawyers would have done," ' but simply whether ' "some reasonable lawyer" ' could have acted, in the circumstances, as defense counsel acted in the case at bar. [Citations.] A defendant must show that his attorney's performance fell below this objective standard of reasonableness by a preponderance of the evidence." (*Jones,* at p. 235.)

*Jones* also pointed out that " 'both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.' " (*Jones, supra,* 186 Cal.App.4th at p. 235, citing *Strickland v. Washington*, *supra*, 466 U.S. at p. 698.) Therefore, as to both performance and prejudice, we owe the trial court no deference. "As to those issues, the trial judge's findings are ' "not binding on this court, and we may reach a different conclusion on an independent examination of the evidence produced at the hearing he conducts even where the evidence is conflicting. [Citation.]" ' " (*Jones,* at p. 236.)

Under the foregoing guidelines, we have little difficulty determining the trial court's conclusion that Selby provided O'Hearn effective assistance is unsustainable.

### Selby's Performance was Professionally Deficient

In *In re Edward S., supra,* 173 Cal.App.4th 387 (*Edward S.*), the trial court sustained a petition alleging the minor came within the provisions of Welfare and Institutions Code section 602 and denied the minor's motion for a new jurisdictional hearing, which newly appointed counsel sought on the ground that the minor had been denied the effective assistance of counsel during the jurisdictional hearing in another county. Reversing the judgment and remanding the matter for a new jurisdictional hearing, we held that the performance of the minor's prior counsel was deficient in that, among other things, he failed to investigate potentially exculpatory evidence. The former

20

attorney, a public defender, filed a declaration in support of the motion for a new jurisdictional hearing, stating that because his office lacked an investigator, he was required to investigate his own cases, which was "all but impossible" due to his heavy caseload.

Former counsel in *Edward S.* knew at the outset that the prosecution's case rested almost entirely on the testimony of the victim, T.S., who had just turned 10, and her mother, Sherry, who was also the minor's aunt, and that the claims of these two prosecution witnesses were uncorroborated. Prior to trial, the former attorney had been informed by Jason S., a relative of the minor, that T.S. "had been molested by an uncle and perhaps also her father, and therefore had been exposed to more sexual conduct than most 10-year-olds, but also that on a specific occasion she threatened to lie in order to work her will. Jason also provided the names of others who could corroborate this information, and told [former counsel] how he could contact these individuals. Additionally, Jason informed [prior counsel] that Sherry was angry with [the minor] because of his relationship with Jason and for this reason, as well as her sensitivity about the molestation of her children by other relatives, had threatened [the minor] that she would 'send him back to juvenile hall.' " (*Edward S., supra*, 173 Cal.App.4th at p. 408.) Despite the potential use of this information to impeach T.S. and Sherry, the prosecution's most crucial witnesses, former counsel made no investigatory efforts.

Acknowledging that former counsel made "errors," the trial court found the evidence he was ineffective inadequate because it mainly consisted of Jason S.'s testimony at the motion for a new jurisdictional hearing, which the trial judge disregarded because he believed it consisted of "multiple layers of hearsay" and was not credible due to the fact that Jason was an ex-felon. (*Edward S., supra,* 173 Cal.App.4th at p. 408.) Rejecting that reasoning, we

21

pointed out that "Jason's credibility was not to be measured from the perspective of a trier of fact at a trial on the merits, as the court did, but from that of an attorney charged with the duty to defend a client against criminal charges." (*Id.* at p. 410.) The question was not whether Jason's claims were true, but whether the attorney's failure to inquire into their truth was reasonable; i.e. would a reasonable attorney in his shoes have felt a professional duty to his client to verify those claims. We found the absence of any effort to verify Jason's claims unreasonable "[g]iven Jason's long relationship with and knowledge of appellant, Sherry, and T.S. and her siblings, the specificity and facial significance of the information he provided, and his identification of others who would assertedly corroborate his claims and his specifying how such persons could be contacted . . . ."

In *Edward S.,* the ineffective assistance arose from unsustainable demands on an overworked public defender who lacked the resources to pursue information his client had been framed. The problem here is not the lack of resources but the blindness of counsel to factors indicating the availability of a potential mental state defense.

As we have said, Selby was told by O'Hearn of past but undefined mental health issues, and the police report, which Selby possessed, indicated that the arresting officers had had numerous prior contacts with O'Hearn regarding his aberrant behavior and considered whether they should initiate commitment proceedings under Welfare and Institutions Code section 5150. Selby's acknowledged concern whether O'Hearn was competent to stand trial should also have caused him to wonder whether his client's mental state might provide a defense; the same is true of Selby's awareness of "[t]he fact that O'Hearn had committed multiple offenses at the same location against

22

multiple victims, in some cases the same victims, and that they all involved being out of control," as Selby testified.

Selby never asserted any strategic reason for failing to learn whether his client's mental state provided the basis for a possible mental defense. The only excuse he offered for this failure is that the availability of mental defenses "would come up later after the prelim." But by failing to seek a continuance or otherwise prevent O'Hearn from entering his guilty plea before Selby understood whether the case was defensible, and failing to negotiate the disposition with the prosecution from an informed position, which investigation would have enabled him to do, Selby rendered potential mental state defenses meaningless.

No reasonable lawyer could have acted as Selby did in the circumstances of this case.

### Selby's Deficient Representation was Prejudicial.

The motion to withdraw centered on the claim that if O'Hearn did not specifically intend his statement to be understood as a threat, he would not be guilty. Indeed, CALCRIM No. 1300 states that to convict a defendant of violating section 422, the People must prove that "[t]he defendant intended that (his/her) statement be understood as a threat and intended that it be communicated to [his victim]." (CALCRIM No. 1300.)

As we have said, O'Hearn's medical records show that he was diagnosed in 2019, as suffering from "psychosis and schizoaffective disorder." "Psychosis" is defined by the Oxford English Dictionary as a "severe mental illness, characterized by loss of contact with reality (in the form of delusions and hallucinations) and deterioration of intellectual and social functioning." According to that dictionary, "schizoaffective" is normally used as an adjective applied to a person "[e]xhibiting symptoms of both psychosis and

23

manic-depressive psychosis."  Potentially, this evidence could have been employed to persuade a jury that O'Hearn's "loss of contact with reality," delusions, and manic depression prevented him from possessing the intentionality necessary to convict him of making a criminal threat.  Yet this evidence—and other evidence of O'Hearn's only episodic use of powerful prescribed medications and repeated hospitalizations in state mental hospitals, which also could have been used in his defense—was never marshalled by Selby.

O'Hearn's motion to withdraw his plea also contended that competent counsel would have recognized that other elements of the charged offense were arguably unsupported by sufficient evidence.  "A violation of [section] 422 requires proof that '[t]he threat was so clear, immediate, unconditional, and specific that it communicated to the victim a serious intention and the immediate prospect that the threat would be carried out;' that '[t]he threat actually caused the victim to be in sustained fear for her own safety;' and that 'the victim's fear was reasonable under the circumstances.'  (CALCRIM 1300.)"  The motion to withdraw argued that no fear of death or serious injury would have been reasonable in this case because O'Hearn was widely known by the police and residents in his apartment complex "as a cranky neighbor but not a dangerous one.  His undifferentiated threat to 'kill' the victims or 'kick [their] ass' did not indicate when or how he would do so, and after making the statement he immediately retreated into his apartment and shut the door.  Even more, the police report itself assertedly acknowledged, O'Hearn was known to neighbors and police alike frequently to make threats. It does not appear he had ever acted on one.  Every threat he had made in the past that went unrealized made it objectively less likely he would make good on the next one."  Had he investigated, Selby would have recognized the

24

potential for arguing that O'Hearn's victims were familiar with his frequent unconventional behavior and aware it had never resulted in violence, which would have eliminated or at least diminished their fear for their own safety.

In arguing O'Hearn would not have pleaded guilty to the charge if he had been informed of the possible defenses available to him, and that the charged offense was a strike, so that violating probation might result in a state prison sentence, defense counsel acknowledged that the fact an offense is a strike is a collateral rather than a direct consequence of a plea, and therefore knowledge of the fact is not a prerequisite to a plea being knowing and voluntary. (Citing *People v. Gurule* (2002) 28 Cal.4th 557, 634, and *People v. Reed* (1998) 62 Cal.App.4th 593, 598.) However, as the motion correctly pointed out, Selby's "failure to inform O'Hearn that he was pleading guilty to a strike," which exposed him to an executed sentence of confinement in state prison, the "failure to advise him that he might avoid such a conviction in exchange for a greater term of imprisonment, or for pleas to the dismissed misdemeanors, deprived the defendant of information he needed to make an informed decision."

O'Hearn was unquestionably prejudiced by Selby's deficient performance. Accordingly, we shall vacate the denial of the motion to withdraw and remand the case to the superior court for trial.

### Postscript

Although not essential to our analysis, this case presents an issue sufficiently significant to warrant comment.

O'Hearn's mental disorder and past conduct strongly suggest that, had he not sought to withdraw his plea, his psychosis and delusions would almost certainly have led him to violate a condition of probation, as happened in the wake of most of his numerous past grants of probation—but this time a

25

probation violation would probably land him in state prison.  The commitment of a mentally ill defendant to state prison is an all too common event in the United States, as shown by evidence that there are 10 times more mentally ill persons in prison or jail in this nation than there are in all of our mental hospitals.[10]

According to the California Department of Corrections and Rehabilitation (CDCR), 32 percent of California's prison population in 2016 consisted of inmates who were mentally ill.[11]  And since the CDCR estimate only includes inmates who have actually received treatment for a "severe mental disorder," the percentage of mentally ill prisoners is almost certainly greater, though even the lower figure represents an increase of 150 percent

---

[10] See, e.g., Torrey et al., The Treatment Advocacy Center, *The Treatment of Persons with Mental Illness in Prisons and Jails; A State Survey* (2014) pp. 6, 101.  A 2015 Report issued by the Stanford Law School Three Strikes Project and co-authored by a former President Pro Tem. of the California Senate states that "over the past 15 years the number of mentally ill people in prison in California has almost doubled.  Today, 45 percent of state prison inmates have been treated for severe mental illness within the past year," and "[t]he Los Angeles County Jail is 'the largest mental health provider in the county.' "  (Steinberg et al., *When Did Prisons Become Acceptable Mental Healthcare Facilities?*  Stan. Law Sch. Three Strikes Project (2015) p. 1.)

[11] CDCR and California Correctional Health Care Services, *Mental Health Bed Need Study* (Jan. 8, 2016).

since 2000.[12]  Imprisonment is anything but conducive to the salutary treatment of mental illness.[13]

These appalling circumstances are tragic not only for mentally disordered offenders, but as well for our society, to which most of the offenders will at some point be released.  Our criminal justice system should not countenance this state of affairs.

---

[12] Romano, Stanford Justice Advocacy Project, *The Prevalence and Severity of Mental Illness Among California Prisoners on the Rise* (2017) p. 1. "Over the past decade California's overall prison population has decreased by approximately 40,000 inmates, or 25 percent." (*Id*. at pp. 2–3.)  "The severity of  inmates' mental illness is also on the rise.  Since 2012, the number of prisoners referred for intensive psychiatric treatment as part of CDCR's Enhanced Outpatient Services (EOP) has increased by 60 percent." (*Id*. at p. 4.)  Unsurprisingly, CDCR has reported that current health care services are significantly understaffed.  (*Id*. at p. 3, fn. 18.)

[13] As one of the most eminent authorities on correctional practices has explained, "given the strong disincentives that exist for prisoners to acknowledge weakness or vulnerability of any kind, there is perhaps no worse place to be labelled 'mentally ill' than in prison.  It diminishes prisoners in the eyes of their fellow inmates because, among other things, it is taken to imply that they are weak, cannot be relied on, and are necessarily allied with and overly dependent on the prison staff (from whom they now need treatment).  In many prisons, mentally ill prisoners—sometimes because of their odd or annoying behavior, or because mental illness is interpreted as a sign of weakness, or sometimes simply as a result of their derogated status —become targets of derision, exploitation, and abuse.  This means that even when persons who are suffering from mental illness *do* become aware of their worsening condition—realize that they are in emotional pain, are losing control of themselves, or are becoming disoriented and unstable—they may still be unable to seek help, and suffer silently instead." (Haney, *"Madness" and Penal Confinement:  Some Observations on Mental Illness and Prison Pain* (2017) 19 Punishment & Society 310, 319.)  Mental illness has also been shown to be significant in reducing the likelihood of parole.  (Caplan, *What Factors Affect Parole:  A Review of Empirical Research* (2007) 71 Federal Probation Journal 16.)

Nine years ago, the United States Supreme Court found that mentally ill inmates of California prisons received constitutionally inadequate care. (*Brown v. Plata* (2011) 563 U.S. 493.) Seven years ago, the three-judge federal court that issued the ruling upheld by the Supreme Court in *Plata* refused to vacate the ruling until the state provides a "durable solution" to the overcrowding that caused the constitutionally inadequate care of mentally disordered prisoners. (*Coleman v. Brown* (E.D.Cal. 2013) 922 F.Supp.2d 1004, 1045.) Because the state has not produced such a solution, the *Plata/Coleman* litigation continues to this day.

The California Legislature has begun to address the problems resulting from the large and growing number of mentally ill persons imprisoned in this state. In 2018, the Governor signed Assembly Bill No. 1810, now embodied in sections 1001.35 and 1001.36 of the Penal Code. This measure was designed to "promote . . . [¶] [i]ncreased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety," "[a]llowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings," and of "[p]roviding diversion that meets the unique mental health treatment and support needs of individuals with mental disorders." (§ 1001.35, subds. (a), (b), and (c).)

The problem identified by the United States Supreme Court in *Plata* and addressed by the Legislature in 2018, was undoubtedly the result of inadequate attention to the mental disorders of many accused persons and defendants during the charging and sentencing processes. This case is a perfect example. Selby was not the only person who showed little or no interest in O'Hearn's apparent mental disorders. So too did the district

28

attorney,[14] the sentencing judge, Casper, the attorney appointed by the court to investigate whether O'Hearn had viable grounds to move to withdraw his plea, even though the disorders were suggested by the nature of O'Hearn's unusual criminal history and described by the probation department in the presentence report. So far as the record shows, neither the probation department, the district attorney, nor the court, questioned the wisdom and efficacy of a sentence including probation conditions O'Hearn was almost certain to violate, which would likely result in his imprisonment—a result sought to be avoided by the United States Supreme Court and the California Legislature.

Nor, so far as the record shows, did anyone ever consider whether it might be appropriate to grant O'Hearn pretrial diversion pursuant to section 1001.36, for which he appears eligible. Unlike the posttrial condition of probation requiring O'Hearn to submit to mental health treatment, the statutory pretrial diversion program is designed not just to treat the needs of mentally disordered defendants but also to mitigate "entry and reentry into the criminal justice system" (§ 1001.35, subd. (a)) and diminish the exorbitant number of mentally ill prisoners in our overcrowded prisons.

Pretrial diversion of mentally ill offenders will not always be appropriate; but the plight of our prisons, the needs of mentally ill prisoners, and the expectations of our Legislature demand that it receive more serious consideration by defense counsel, prosecutors, probation departments, and sentencing courts than it did in this case.

---

[14] Section 1001.36 explicitly contemplates that the request for diversion the court "shall consider" may be not just that of the defense, but also "the request of the prosecution . . . ." (§ 1001.36, subd. (c)(1)(B).)

## DISPOSITION

The judgment is reversed and the matter is remanded to the Marin County Superior Court with directions to conduct a trial.

_____

Kline, P.J.

We concur:


_____

Richman, J.


_____

Miller, J.


*People v. O'Hearn* (A158676)

31

Trial Court:                    Marin County Superior Court

Trial Judge:                    Hon. Paul M. Haakenson

Attorney for Appellant:         By Appointment of the Court of Appeal
                                Under the First District Appellate Project
                                Donald L. Lipmanson

Attorneys for Respondent:       Attorney General of California
                                Xavier Becerra

                                Lance E. Winters
                                Chief Assistant Attorney General

                                Jeffrey M. Laurence
                                Senior Assistant Attorney General

                                Catherine A. Rivlin
                                Supervising Deputy Attorney General

                                Rene A. Chacon
                                Supervising Deputy Attorney General